In re CITIZENS AND LANDOWNERS AGAINST the MILES CITY/NEW UNDERWOOD POWERLINE; Joseph D. Bruch; Floyd A. Cammack; Anthony H. Bruch; Henry Bruch; Rex Schreckenghaust and South Dakota Public Utilities Commission

v.

SECRETARY, UNITED STATES DEPARTMENT OF ENERGY, in his official capacity; Golden Area Manager, Western Area Power Administration, in his official capacity, Billings Area Manager, Western Area Power Administration, in his official capacity and Grand Electric Cooperative, Inc.

No. CIV81–5021.

United States District Court, D. South Dakota.

May 5, 1981.

Roberta Jean Earley, Spearfish, S. D., for plaintiffs.

Terry Pechota, U. S. Atty., Sioux Falls, S. D., S. Walter Washington, Public Utilities Comm., Pierre, S. D., Newell E. Krause, Mobridge, S. D., Gene N. Lebrun, Rapid City, S. D., for defendant.

## MEMORANDUM OPINION

BOGUE, Chief Judge.

This case concerns the construction of the Miles City/New Underwood transmission line, which, when finished, will be a 230 kilovolt electrical transmission line running from Miles City, Montana, to New Underwood, South Dakota. The portion of the line in South Dakota is being constructed by the Western Area Power Administration (WAPA), an agency of the Department of Energy.[1]

Plaintiffs are five individual landowners, and the group they have formed, whose land will be crossed by the powerline. Plaintiffs oppose the route chosen for the powerline. They contend that the Environmental Impact Statement (EIS) prepared by the Defendants is inadequate in that it failed to adequately consider alternatives and that it failed to contain a statement of the relationship between the local short-term uses of the environment and the main-tenance and enhancement of long-term productivity for the South Dakota portion of the line. Plaintiffs also allege that Defendants failed to adequately circulate the EIS and failed to consider public comment on the project. Furthermore, Plaintiffs allege that Defendants violated the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321 et seq. by approving an inadequate EIS. Plaintiffs also charge Defendants with violations of the National Historic Preservation Act (NHPA), 16 U.S.C. §§ 470 et seq. and the Archaeological Resources Protection Act (ARPA), 16 U.S.C. §§ 470aa et seq. in that the cultural resource investigation done in conjunction with the preparation of the EIS was inadequate.

In addition to violations of federal law, Plaintiffs also allege that Defendants have violated South Dakota law. Plaintiffs main allegation in regard to this contention is that Defendants failed to obtain a permit for construction of the line from the South Dakota Public Utilities Commission (PUC) as required by South Dakota's siting law, S.D.C.L. 49–41B.[2] Plaintiffs also allege various other violations of state law.[3]

Plaintiffs' prayer for relief asks this Court to declare that the EIS prepared by Defendants is inadequate and that its preparation was arbitrary and capricious. Plaintiffs ask that this Court enjoin any further construction of the powerline until Defendants comply with federal and state laws. Plaintiffs also ask that all condemnation proceedings in regard to the powerline also be enjoined until a proper EIS is filed and Defendants comply with state laws.

This Court sees three basic issues to be addressed in this case. First of all, this

---

1. Construction of the line is completed from Miles City to just north of the Plaintiffs' property. Construction crews skipped Plaintiffs' property and have nearly completed construction of the line from south of Plaintiffs' property to New Underwood.

2. The state of South Dakota has intervened in regard to this issue also arguing that WAPA should be required to obtain a permit from the PUC. Defendants contend that they do not have to comply with South Dakota procedural law.

3. Specifically, Plaintiffs allege violations of S.D. C.L. 31–26–1 and 31–26–3 for Defendants' alleged failure to consult with county governments about the location of poles and fixtures. Plaintiffs also allege violation of S.D.C.L. 49–41B–3 for Defendants' failure to submit a ten-year plan to the PUC, and violation of S.D.C.L. 49–41B–4.1 for Defendants' failure to obtain legislative approval for the line.

opinion will address the adequacy of the EIS. Secondly, the question of Defendants' obligation to comply with the various state statutes in question will be addressed. And finally, this Court will consider the question of laches which has been raised by the Defendants.

## ADEQUACY OF EIS

■ NEPA requires that officials preparing an EIS consider the following five factors: (1) the environmental impact of the proposed action; (2) any adverse environmental effects which cannot be avoided should the proposal be implemented; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented. 42 U.S.C. § 4332(2)(C). Plaintiffs allege that the EIS in question is deficient in all aspects. Plaintiffs complain that the effect of the cutting down of trees, the effect on the resale value of their land, the negative esthetic effect of a powerline, the effect on animals, the effect on crop spraying[4] and various other things were not considered in the preparation of the EIS. However, Plaintiffs' main complaint centers on Defendants' alleged failure to properly consider an alternative plan proposed by the Plaintiffs which would reroute the line some distance to the west.

■ The test of compliance with the procedural provisions of NEPA is one of good faith objectivity. *Minnesota Public Interest Research Group v. Butz,* 541 F.2d 1292 (8th Cir. 1976) *cert. denied* 430 U.S. 922, 97 S.Ct. 1340, 51 L.Ed.2d 601 (1977). In *Butz,* the Eighth Circuit Court of Appeals stated:

[T]he EIS need contain only sufficient information to permit a reasoned choice of alternatives.... The purpose of NEPA is not to require an objection free document, but rather to give Congress,

the responsible agencies, and the public a decision-making tool. *Id.* at 1300.

The court went on to say:

The standard of substantive review under NEPA is an extremely narrow one.... The reviewing court must first determine whether the agency reached its decision after a full, good faith consideration and balancing of environmental factors. *Id.*

■ This Court has thoroughly studied the EIS in question and finds it to be sufficient to allow those concerned to make a responsible decision. Although Plaintiffs' evidence indicates that there might be some deficiencies in the EIS, the burden is on the Plaintiffs to prove that the EIS is "fatally flawed" and "this burden is not met by merely establishing a *prima facie* showing of deficiencies." *National Center For Preservation Law v. Landrieu,* 496 F.Supp. 716, 737 (D.S.C.1980), *aff'd* 635 F.2d 324 (4th Cir. 1980).

■ While it is true, as Plaintiffs frequently pointed out during the course of the trial, that the main alternative route proposed by Plaintiffs is not mentioned in the EIS, the failure to consider all possible alternatives certainly does not make an EIS defective.

[A]n infinite variety of alternatives is permissible in almost every administrative decision of this nature.... This being so, there must be an end to the process somewhere.... So long as there are unexplored and undiscussed alternatives that inventive minds can suggest, without a rule of reason, it will be technically impossible to prepare a literally correct environmental impact statement.... *Fayetteville Area Chamber of Commerce v. Volpe,* 515 F.2d 1021, 1027 (4th Cir. 1975).

The EIS in question is a relatively short one, however, brevity alone does not make an EIS inadequate. *Iowa Citizens For Environmental Quality, Inc. v. Volpe,* 487 F.2d 849, 852 (8th Cir. 1973); *Woida, supra,* at

---

**4.** The need for an EIS to consider crop spraying was addressed in the case of *Woida v. United States,* 446 F.Supp. 1377 (D.Minn.1978), where-

in it was held that the failure of an EIS to consider the effect of a powerline on crop spraying did not make the EIS defective.

1387. Although this Court might have done things somewhat differently if it had been preparing the EIS, this is not the test.

Neither the statute nor its legislative history contemplates that a court should substitute its judgment for that of the agency as to the environmental consequences of its actions. (Citation omitted) The only role for a court is to insure that the agency has taken a "hard look" at environmental consequences; it cannot "interject itself within the area of discretion of the executive as to the choice of the action to be taken." *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21, 96 S.Ct. 2718, 2730 n.21, 49 L.Ed.2d 576 (1976).

In no case that this Court has found has any court required a "perfect" EIS. This Court feels that the preparer of the EIS took a "hard look" at the environmental consequences of their action and this Court will not attempt to second guess them. As a result, this Court finds that the EIS was prepared in compliance with NEPA.

A couple of other issues in regard to the EIS must also be touched upon. Plaintiffs allege that Defendants did not adequately make the draft EIS available to governmental agencies and the public and failed to consider public comment. The final EIS shows that the draft was sent to a number of federal, state and local agencies and that a number of public meetings were held concerning the powerline. The testimony showed that Plaintiffs were allowed a number of opportunities to express their views regarding the powerline. Just because those in charge decided not to follow Plaintiffs' suggestions does not mean that their comments were not considered. This Court finds no merit to Plaintiffs' contention that the EIS was not adequately circulated or that public comments were not considered.

■ As noted earlier, Plaintiffs also allege violations of NHPA and ARPA. Defendants argue that these acts are not applicable to this case at this point in time.

See *Hart v. Denver Urban Renewal Authority*, 551 F.2d 1178 (10th Cir. 1977); *Kent County Council for Historic Preservation v. Romney*, 304 F.Supp. 885 (W.D.Mich. 1969). This Court sees no need to address the issue raised by these cases because it feels that Plaintiffs have failed to establish any violation of these Acts in the cultural resource investigation.[5]

Based on the foregoing this Court finds the EIS prepared by the Defendants to be adequate and further finds that it has not been shown that Defendants violated either NEPA, NHPA or ARPA.

## STATE LAW ISSUE

■ The other major issue in this case is whether WAPA is required to comply with South Dakota's siting law and various other South Dakota statutes. This question comes down to one of statutory interpretation. The acts to be considered are the Federal Land Policy and Management Act (FLPMA), 43 U.S.C. § 1701 *et seq.* and the act creating the Department of Energy, 42 U.S.C. § 7101 *et seq.*

In South Dakota, the powerline crosses three tracts of federal land totalling about one-third mile. WAPA has received a permit to cross these lands from the United States Bureau of Land Management and the United States Forest Service pursuant to 43 U.S.C. § 1767. Under 43 U.S.C. § 1765, each right of way granted under FLPMA is required to contain

terms and conditions which will ... require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation, and maintenance of or for rights-of-way for similar purposes if those standards are more stringent than applicable Federal standards.

In *Columbia Basin Land Protection Ass'n v. Schlesinger*, 643 F.2d 585 (9th Cir. 1981), the issue of whether this statute required WAPA's sister agency, the Bonneville Pow-

---

5. Although Plaintiffs presented a witness who attacked the cultural resource investigation, it appears to this Court that an adequate investigation was done and, as stated earlier, this Court will not attempt to substitute its judgment for the judgment of those responsible for the preparation of the EIS.

er Administration (BPA), to comply with the state of Washington's siting act and apply for a certificate from the governor was addressed. The Ninth Circuit Court of Appeals determined that Congress did not intend to force BPA to comply with the procedural requirements of Washington's siting act, but that BPA did have to comply with substantive Washington law. The court stated:

[T]o require BPA to receive a state certificate would imply that the state could deny the application, which would give them a veto power over the Federal project. This clearly cannot be the meaning that Congress intended. Much stronger language would be needed for us to conclude that Congress was delegating so much power from the federal government to the states. Congress would not delegate such an important function as the decision of whether and where to distribute electric power from federal facilities to total state control in such a brief statement. *Id.* at 605.

*See also Hancock v. Train*, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976); *Environmental Protection Agency v. California ex rel. State Water Resources Control Board*, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976).

The situation with the federal land crossed by the powerline in question is exactly the same as that in *Columbia Basin.* This Court agrees with the reasoning in *Columbia Basin* and therefore, determines that, at least in regard to the federal land, Defendants are not required to obtain a PUC permit or comply with any other procedural state laws.

The remainder of the land crossed by the powerline is non-federal land and is thus covered by the Department of Energy Act. The portions of that act dealing with state requirements reads as follows:

Whenever any proposed action by the Department conflicts with the energy plan of any State, the Department shall give due consideration to the needs of such State, and where practicable, shall at-

tempt to resolve such conflict through consultations with appropriate State officials. Nothing in this chapter shall affect the authority of any State over matters exclusively within its jurisdiction. 42 U.S.C. § 7113.

In comparing this language with the language of FLPMA which requires "compliance with State standards," it appears that the FLPMA language evidences more of an intent than the language in the Department of Energy Act. Yet, the court in *Columbia Basin* found this language insufficient to require a government agency to comply with state procedural laws. This Court agrees with the *Columbia Basin* court that if Congress had intended the states to have the ability to halt a federal project by simply refusing to issue a permit, such an intent would be expressed in unmistakably clear language. Such is not the case here.

Therefore, it appears to this Court that Defendants are not required to obtain a permit from the PUC or comply with any of the procedural requirements contained in the other South Dakota statutes Plaintiffs claim have been violated by Defendants. Since no evidence has been produced that Defendants have violated any substantive state laws, the failure of Defendants to comply with certain procedural laws affords no basis to halt construction of the powerline.

### LACHES

■ Although the main arguments and authorities asserted by Plaintiffs in support of their request for injunctive relief have been determined adversely to Plaintiffs, this Court will also address the laches issue to buttress its opinion that Plaintiffs are not entitled to any relief. To adequately discuss this issue, a somewhat detailed factual discussion is necessary.

The first discussions with local officials regarding the powerline's construction occurred on February 7, 1978, when officials of WAPA met with the Meade County Commissioners.[6] On March 9, 1978, a letter

---

6. Plaintiff landowners are Meade County residents.

was sent from the Department of Energy to all landowners within the corridor selected for the powerline informing these landowners about the proposed powerline and notifying them of informational meetings to be held in April. These meetings took place on April 4, 5 and 6, 1978, at New Underwood, Union Center, and Bison, South Dakota, respectively. Four of the five Plaintiff landowners attended the Union Center meeting. In May, 1978, WAPA representatives contacted several of the Plaintiff landowners regarding surveys of their land.

The PUC was also aware of the proposed powerline in early to mid-1978. On June 7, 1978, a meeting between a WAPA representative and a PUC representative was held. The following day a letter was sent from WAPA to the PUC citing a case as authority for WAPA's position that it was not required to obtain a PUC permit to construct the powerline in South Dakota.

On August 31, 1978, the draft EIS was issued and sent to a number of federal, state and local agencies and also public libraries in the affected areas. A copy was also sent to the PUC. On September 7, 1978, a letter was sent from the PUC to WAPA regarding the powerline. On November 16, 1978, a public meeting concerning the draft EIS was held in Bison, South Dakota. On June 30, 1979, WAPA again contacted the PUC regarding the line.

The final EIS was issued on July 30, 1979. During August of 1979, landowners in the Stoneville-Union Center area signed a petition protesting the line's location. This petition was sent to a representative of the Department of Energy on September 4, 1979. This petition prompted a meeting on September 27, 1979, at which time the landowners were told that their number one alternative could not be considered at that point because it was outside the six mile corridor which had been studied in preparing the EIS.[7]

The next documented contact with Plaintiff landowners came in late June, 1980, when a WAPA appraiser contacted several of the Plaintiffs regarding permission to inspect their property for appraisal purposes. In August and September, 1980, a realty specialist with WAPA made numerous contacts with Plaintiff landowners. In August through October of 1980, WAPA made offers to purchase easements on Plaintiff landowners' property.

On September 18, 1980, the contractor for the powerline began unloading materials in South Dakota. On October 1, 1980, WAPA sent a letter to the Meade County Commission detailing the construction plans for the project. On October 29, 1980, the contractor began unloading large wire reels at Maurine, South Dakota. Wire reels were unloaded at Union Center on November 6, 1980. Poles were unloaded at Maurine on November 11, 1980.

On December 5, 1980, a meeting was held between WAPA representatives and Plaintiff landowners' attorney at Union Center. At this meeting, the Fairpoint alternative was again proposed. On December 10, 1980, Plaintiffs' attorney wrote to WAPA outlining two alternative proposals, one being the Fairpoint alternative and the other being an alternative for no action south of Maurine. On December 23, 1980, WAPA sent a letter to Plaintiffs' attorney rejecting her proposal.

On January 12–15, 1981, condemnation actions were filed by the United States against Plaintiffs' property. On January 26, 1981, the summons and complaint in this matter was filed. During February, 1981, WAPA and the PUC exchanged more letters about the permit issue. The Federal Defendants answered Plaintiffs' complaint on March 20, 1981. Plaintiffs took no further action in regard to this lawsuit until April 8, 1981, when a motion for a Tempo-

---

7. The proposal supported at that meeting is the same proposal which is presently supported by the Plaintiff landowners. It is referred to as the Fairpoint alternative and, if adopted, would require the preparation of a supplemental EIS which would take a minimum of one year to prepare.

rary Restraining Order was filed.[8] The Temporary Restraining Order was granted by this Court on the same day. On April 10, 1981, a preliminary injunction hearing was held. On April 11, 1981, Plaintiffs' motion for a Preliminary Injunction was denied. Plaintiffs immediately appealed this decision to the Eighth Circuit Court of Appeals and it was affirmed on April 21, 1981, and remanded for an expedited trial on the merits. This same day, the PUC moved to intervene in this case. That motion was granted on April 22, 1981. The trial on the merits was commenced on April 28, 1981.

The history leading up to the filing of this case and the eventual trial is a clear case of parties sitting on their rights. Both the Plaintiff landowners and the PUC knew of the proposed construction of the powerline in 1978. They were both continually reminded of it throughout 1978, 1979 and 1980. Yet, it was not until late 1980 that the Plaintiff landowners took steps to employ an attorney to represent them. And even after their attorney was employed, they were content to sit back and not take any action until the powerline construction crews were on their doorstep. The December 23, 1980, letter from WAPA unequivocally rejected the alternatives proposed by Plaintiffs, yet it was not until more than a month later that this lawsuit was filed. Several of the Plaintiffs testified they were aware of the presence of the wire reels and poles in 1980 and their January, 1981 complaint states that construction has begun in South Dakota. (¶ 19, Plaintiffs' complaint) Despite this, they waited until April to take any sort of action. By April, point construction crews were only a few miles north of Maurine, South Dakota. Plaintiffs should have attempted to assert their rights long before they did. They knew of the proposed route for over two years before

they did anything but make a few oral complaints. And even after they filed their lawsuit they waited over two months to ask this Court for any emergency relief.

The PUC also showed a lack of concern for asserting their contentions. The PUC knew in 1978 that WAPA did not intend to apply for a permit, but it was not until three years later, when they intervened in this lawsuit, that they took any positive steps to assert their rights.

Granting an injunction at this point would cause severe hardship for both the Federal Defendants and Defendant Intervenor Grand Electric Cooperative, Inc.[9] A great deal of this potential damage could have been avoided if Plaintiffs had asserted their rights in a timely fashion.

In order for the doctrine of laches to bar litigation, the Defendant must show three things:

1) a delay in asserting a right or claim;

2) that the delay was not excusable; and

3) that there was undue prejudice to the party against whom the claim is asserted. *Save Our Wetlands, Inc. v. U. S. Army Corps of Engineers*, 549 F.2d 1021, 1026 (5th Cir. 1977), *cert. denied* 434 U.S. 836, 98 S.Ct. 126, 54 L.Ed.2d 98 (1977).

These criteria have been met in this case. Therefore, this Court feels that laches would also act as a bar to Plaintiffs' requested relief.

For further authority supporting this Court's determination regarding the doctrine of laches, *see Environmental Defense Fund, Inc. v. Alexander*, 614 F.2d 474 (5th Cir. 1980); *Environmental Defense Fund, Inc. v. Corps of Engineers of the United States Army*, 470 F.2d 289 (8th Cir. 1972); *Sierra Club v. Cavanaugh*, 447 F.Supp. 427 (D.S.D.1978); *Woida, supra.*

---

**8.** Although Plaintiffs' complaint asked for an order enjoining construction of the powerline, it is the policy of this Court not to take any expedited action regarding such a prayer for relief until such time as a party asks for such action. In this case that was not done until April 8.

**9.** See this Court's Findings of Fact and Conclusions of Law filed after denial of Plaintiffs' request for a preliminary injunction for a discussion of the harm which would result to the Defendants if an injunction was granted at this time.

Based on the foregoing, this Court determines that Plaintiffs are entitled to no relief and that their requests for declaratory and injunctive relief will be denied.

The foregoing constitutes this Court's Findings of Fact and Conclusions of Law.