683 F.2d 1171
 48 P.U.R.4th 587, 13 Envtl. L. Rep. 20,540
 CITIZENS AND LANDOWNERS AGAINST THE MILES CITY/NEW UNDERWOOD
POWERLINE; Joseph D. Bruch, Floyd A. Cammack; Anthony H.
Bruch; Henry Bruch, Rex Schreckenghaust, South Dakota Public
Utilities Commission, Appellant,
v.
SECRETARY, UNITED STATES DEPARTMENT OF ENERGY, in his
official capacity; Golden Area Manager, Western Area Power
Administration, in his official capacity; Billings Area
Manager, Western Area Power Administration in his official
capacity, Grand Electric Cooperative, Inc., Appellees.
CITIZENS AND LANDOWNERS AGAINST THE MILES CITY/NEW UNDERWOOD
POWERLINE; Joseph D. Bruch, Floyd A. Cammack;
Anthony H. Bruch; Henry Bruch, Rex
Schreckenghaust, Appellants,
South Dakota Public Utilities Commission
v.
SECRETARY, UNITED STATES DEPARTMENT OF ENERGY, in his
official capacity; Golden Area Manager, Western Area Power
Administration, in his official capacity; Billings Area
Manager, Western Area Power Administration, in his official
capacity; Grand Electric Cooperative, Inc., Appellees.
 Nos. 81-1544, 81-1718.
 United States Court of Appeals,
Eighth Circuit.
 Submitted Jan. 13, 1982.
Decided July 16, 1982.
 
 Mark V. Meierhenry, Atty. Gen. of S. D., Walter Washington, Asst. Atty. Gen., Public Utilities Com'n, Pierre, S. D., for appellant South Dakota Public Utilities Com'n.
 Roberta Jean Earley, Spearfish, S. D., for appellants.
 Marvin D. Truhe, Gene N. Lebrun, Lynn, Jackson, Shultz & Lebrun, P. C., Rapid City, S. D., Newell E. Krause, Krause & Seiler, Mobridge, S. D., for appellee Grand Elec. Coop.
 Philip N. Hogen, U. S. Atty., D. S. D., Sioux Falls, S. D., Ted L. McBride, Asst. U. S. Atty., Rapid City, S. D., for appellees.
 Before HEANEY, BRIGHT and STEPHENSON,* Circuit Judges.
 HEANEY, Circuit Judge.
 
 
 1
 This case involves the construction of a 230-kilovolt electrical transmission line from Miles City, Montana, to New Underwood, South Dakota. Appellants-South Dakota landowners, the citizens group they formed, and the South Dakota Public Utilities Commission-appeal from a decision of the district court denying their motion to enjoin construction of the powerline until the appellees have corrected certain asserted violations of state and federal law. We agree with the district court, 513 F.Supp. 257, that the complaint of the landowners and their organization is barred by the doctrine of laches and that, contrary to the contentions of the Commission, the appellees need not obtain a state permit to construct the powerline. Accordingly, we affirm the judgment of the court below.
 
 I.
 
 2
 The Western Area Power Administration (WAPA), an agency of the United States Department of Energy which markets and transmits electric power in the western area of the country, began construction of the Miles City-New Underwood powerline at the South Dakota border in September, 1980.[1] At no time did WAPA apply for a state permit to construct the powerline as required by S.D. Codified Laws Ann. § 49-41B. The decision to undertake the project was made after the completion of a study, published in May, 1978, identifying deficiencies in WAPA's transmission facilities.
 
 
 3
 WAPA conducted several public meetings in northwestern South Dakota in April, 1978, to inform local landowners that a six-mile wide corridor in the vicinity of their property was being studied for the project, but that the line's exact location within the corridor had not yet been selected. WAPA issued a draft Environmental Impact Statement (EIS) on August 31, 1978. The draft included a map showing the proposed corridor running through Maurine, Union Center and Stoneville, South Dakota. The corridor crossed appellant-landowners' property. WAPA released the final EIS on July 30, 1979. The proposed corridor in the final EIS was the same as in the draft version. Neither EIS fixed the exact location of the powerline within the corridor. The record does not reveal when WAPA announced the line's precise route. It shows, however, that appellant-landowners knew by fall 1980 at the latest that the line would cross their property.
 
 
 4
 After several meetings and exchanges of correspondence between the landowners and WAPA officials during 1979 and 1980, the agency rejected the citizens' proposed alternative routes in December, 1980,[2] and commenced condemnation proceedings in mid-January, 1981. Shortly thereafter, this lawsuit was initiated.
 
 
 5
 The plaintiffs were five individual landowners whose property is crossed by the powerline and the nonprofit organization they formed, Citizens and Landowners Against the Miles City/New Underwood Powerline (CLAMP). They contended that the EIS prepared by WAPA was inadequate, largely because it did not address their primary alternative route, and that WAPA failed to adequately circulate the EIS and failed to properly consider public comment on the project. Furthermore, the plaintiffs alleged that the defendants violated the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., the National Historic Preservation Act, 16 U.S.C. §§ 470 et seq., and the Archaeological Resources Protection Act, 16 U.S.C. §§ 470aa, et seq., by approving an inadequate EIS. In addition to violations of federal law, the plaintiffs alleged that the defendants violated South Dakota law by failing to obtain a permit for construction of the line from the South Dakota Public Utilities Commission as required by South Dakota's siting law, S.D. Codified Laws Ann. § 49-41B.[3]
 
 
 6
 In their prayer for relief, the plaintiffs asked the district court to declare the EIS inadequate, and to enjoin further construction of the powerline until the defendants prepared a proper EIS and otherwise complied with applicable federal and state laws. The plaintiffs also asked that all condemnation proceedings related to the powerline be enjoined until the defendants fulfilled their statutory duties.
 
 
 7
 At trial,[4] the South Dakota Public Utilities Commission intervened as a plaintiff, and Grand Electric Cooperative, which had contracted with WAPA to purchase electrical power to supply to its retail customers, intervened as a defendant. The district court denied the plaintiffs relief, finding that (1) the EIS prepared by WAPA was adequate; (2) WAPA violated neither the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., the National Historical Preservation Act, 16 U.S.C. §§ 470 et seq., nor the Archaeological Resources Protection Act, 16 U.S.C. §§ 407aa et seq.; (3) WAPA was not required to comply with the South Dakota siting law or the other state statutes relied upon by the plaintiffs; and (4) the plaintiffs' action was barred by the doctrine of laches.
 
 
 8
 The plaintiffs now appeal to this Court.
 
 II.
 
 9
 Laches is an equitable defense. The doctrine, therefore, is flexible; no fixed or arbitrary period of time controls its applicability. E.g., Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 805-806 (8th Cir. 1979). In determining whether the doctrine of laches should bar a lawsuit, all the particular circumstances of each case must be considered, including the length of delay, the reasons for it, its effect on the defendant, and the overall fairness of permitting the plaintiff to assert his or her action. Id. at 806. Accordingly, we will briefly summarize the events leading up to the initiation of this lawsuit.
 
 
 10
 The first discussions regarding the powerline occurred in January and February, 1978, when WAPA officials conducted informational meetings and met with the Meade County Commissioners.[5] On March 9, 1978, the Department of Energy sent a letter to each landowner within the corridor selected for the powerline, notifying them of informational meetings to be held in April. The project and the necessity for easements were discussed at these meetings, which took place on April 4, 5 and 6, 1978, at New Underwood, Union Center and Bison, South Dakota, respectively. Four of the five appellant-landowners attended the Union Center meeting. Between May 3, 1978, and May 17, 1978, WAPA representatives contacted several CLAMP members requesting permission to conduct surveys on their property.
 
 
 11
 On August 31, 1978, the draft EIS was issued and sent to a number of federal, state and local agencies, as well as public libraries in the affected areas. A copy was also sent to the South Dakota Public Utilities Commission. A public meeting concerning the draft EIS was held on November 16, 1978, in Bison, South Dakota. At that meeting, a WAPA representative gave formal notice that the official record for the project would remain open until November 22, 1978.
 
 
 12
 The final EIS was issued on July 30, 1979. It stated that construction would begin in spring, 1980, and it would be completed in late 1981. Landowners in the Stoneville-Union Center area sent a petition protesting the line's location to the Department of Energy on September 4, 1979. A meeting with WAPA officials followed on September 27, 1979, at which the landowners presented two alternative routes.[6]
 
 
 13
 Appellant-landowners were again contacted in June, 1980, by a WAPA appraiser requesting permission to inspect their property for appraisal purposes. In August through October, 1980, WAPA's realty specialist made numerous contacts with the appellant-landowners and WAPA made offers to purchase easements over their property.
 
 
 14
 Construction of the line in South Dakota began on September 18, 1980, when the contractor began unloading materials for construction along the right-of-way. On October 1, 1980, WAPA sent a letter to the Meade County Commissioners containing maps of the line and details of its construction. By October 27, 1980, construction crews on the right-of-way began actual physical construction of the line. The contractor began unloading large wire reels at Maurine and Union Center on October 29, 1980, and November 6, 1980, respectively.
 
 
 15
 On December 5, 1980, at a meeting with representatives, the attorney representing appellant-landowners and CLAMP again proposed the Fairpoint alternative. On December 10, 1980, the attorney wrote to WAPA outlining two alternative proposals, one again was the Fairpoint alternative and the other was for no action south of Maurine. On December 23, 1980, WAPA sent a letter to appellants' attorney rejecting her proposals.
 
 
 16
 On January 12-15, 1981, condemnation actions were filed by the United States against appellant-landowners' property. On January 26, 1981, the summons and complaint in this matter was filed following unsuccessful negotiations for the purchase of easements over their property. The landowners and CLAMP took no further action to halt construction until April, 1981, when they sought a temporary restraining order and preliminary injunction, both of which were ultimately denied. See supra, at 1174 n.4. The expedited trial on the merits was commenced shortly thereafter. Id.
 
 III.
 
 17
 Although laches is not favored in environmental cases, it is properly invoked when a party seeking injunctive relief has engaged in unreasonable and inexcusable delay which results in undue prejudice to the other party. See Woida v. United States, 446 F.Supp. 1377, 1390-1391 (D.Minn.1978); Clark v. Volpe, 342 F.Supp. 1324, 1329-1330 (E.D.La.), aff'd, 461 F.2d 1266 (5th Cir. 1972). The district court concluded that on the facts present here, laches barred the requests for relief made by the landowners and CLAMP. We agree.
 
 
 18
 It is clear that the landowners and CLAMP engaged in a lengthy delay in instituting this lawsuit. They first learned of WAPA's proposal to construct the powerline in its present location in early 1978. They were continually reminded of its construction during 1978, 1979 and 1980. Nonetheless, they waited until April 1981-a delay of some three years-to move to enjoin the line's construction. We believe that this delay was plainly unreasonable, unless the appellants have a satisfactory excuse which justifies their inaction.
 
 
 19
 In the court below, the landowners and CLAMP contended that they did not know until April, 1981, that construction had begun. This contention is plainly contrary to the evidence. Indeed, the appellants' own complaint, filed in January, 1981, explicitly states that "(c)onstruction of the powerline has already begun by defendants in South Dakota." It is simply inconceivable on the record outlined above that the landowners did not know that construction had begun prior to their motions to enjoin the project.
 
 
 20
 On appeal, the landowners and CLAMP for the first time raise a second justification for their delay in bringing suit. They allege that they relied on misrepresentations by WAPA, which continued until December, 1980, that the agency was still considering requests to reroute the powerline.[7]
 
 
 21
 Although there is some evidence that government officials did indicate that the powerline's location possibly could be altered as late as December, 1981, the record establishes that the landowners had knowledge long before they sought an injunction in April, 1981, that WAPA, for all practical purposes, had selected the line's location, and that it would cross their property.
 
 
 22
 The record reveals that the landowners were aware of the proposed powerline corridor by mid-1979 to early 1980.[8] It also shows that they had knowledge of the line's exact location by no later than August, 1980, when WAPA officials entered into negotiations with them regarding easements over their property.[9] In September, 1980, the first equipment and material for construction were unloaded along the right-of-way line, in South Dakota; and by November, 1980, wire and poles had been delivered to Maurine, Union Center and Stoneville. The landowners concede that they saw the equipment and material shortly after it was delivered. In November, 1980, an attorney contacted by appellant Schreckenghaust informed him that there were apparently no administrative appeals available to protest the line's location.[10]
 
 
 23
 On the basis of this evidence, it is clear that the landowners knew far in advance of April, 1981, that the powerline would cross their property. The fact that government officials held out some slight hope throughout 1980 that the route could be changed should not have been sufficient to dissuade the appellants from moving to protect their rights-particularly when WAPA took the definitive steps of seeking easements, surveying property and delivering material. Moreover, the fact that WAPA officials continued to seek community input through hearings and correspondence during 1979 and 1980 does not translate into misrepresentation by the government.
 
 
 24
 We agree then with the district court's conclusion that the three-year delay by the landowners and CLAMP in seeking to enjoin the line's construction was unreasonable and inexcusable. The only remaining question is whether the court below properly determined that the appellees were unduly prejudiced by the delay.
 
 
 25
 The prejudice to the appellees is substantial. The powerline is now complete and in operation.[11] The preparation of another draft and final EIS, particularly for a new corridor, would be both costly and time consuming.
 
 
 26
 The landowners and CLAMP ultimately seek to have the powerline rerouted. Consequently, WAPA would incur major expenses, in addition to selecting a new route and preparing the necessary EIS if the location was altered. Parts of the present line would have to be torn down. The new route would have to be surveyed. Easement negotiations and condemnation proceedings would have to be instituted, and then the line would have to be reconstructed-over the property of persons who also likely would oppose its presence on their land.
 
 
 27
 Moreover, there would be significant effects if the powerline was shut down because of rerouting. For example, appellee Grand Electric cannot use its newly constructed Bison substation if the powerline is not in operation. Consequently, Grand Electric and its members would be forced to pay an $8,900 monthly debt service on the substation while the unit was producing no revenue. More importantly, residential and commercial electrical consumers in northwestern South Dakota would face significant power shortages.
 
 
 28
 Based on the foregoing, we agree with the district court that the appellants' delay in seeking relief has unduly prejudiced the appellees. As a result of the delay, the defendants have committed substantial resources that they may not have if the appellants had acted in a timely manner to obtain the relief they now seek. See Goodman v. McDonnell Douglas Corp., supra, 606 F.2d at 808 & n.17. Accordingly, because the delay in commencing suit was unreasonable, inexcusable and unduly prejudicial to the appellees, the court below properly found that laches bars the claims of the landowners and CLAMP.[12]IV.
 
 
 29
 Appellant South Dakota Public Utilities Commission (Commission) intervened to protest WAPA's failure to comply with the South Dakota Energy Conversion and Transmission Facility Act, which requires WAPA to obtain a state siting permit, S.D. Codified Laws Ann. § 49-41B-4.[13] The district court held that under the Supremacy clause of the United States Constitution, WAPA was not subject to the regulations of the South Dakota siting law.[14] We agree.
 
 
 30
 In Hancock v. Train, 426 U.S. 167, 178, 96 S.Ct. 2006, 2012, 48 L.Ed.2d 555 (1976), the Supreme Court stated:
 
 
 31
 It is a seminal principle of our law "that the constitution and the laws made in pursuance thereof are supreme; that they control the constitution and laws of the respective States, and cannot be controlled by them." M'Culloch v. Maryland, 17 U.S. (4 Wheat.) 316, 426, 4 L.Ed. 579 (1819).
 
 
 32
 Accordingly, "the activities of the Federal Government are free from regulation by any state." Id. at 178, 96 S.Ct. at 2012, quoting Mayo v. United States, 319 U.S. 441, 445, 63 S.Ct. 1137, 1139, 87 L.Ed. 1504 (1943) (footnote omitted).
 
 
 33
 Congress, of course, may choose to subject its instrumentalities or property to state regulation. However,
 
 
 34
 (b)ecause of the fundamental importance of the principles shielding federal installations and activities from regulation by the States, an authorization of state regulation is found only when and to the extent there is "a clear congressional mandate," "specific congressional action" that makes this authorization of state regulation "clear and unambiguous."
 
 
 35
 Id. 426 U.S. at 179, 96 S.Ct. at 2012 (footnotes omitted).
 
 
 36
 The Commission argues that Section 103 of the Department of Energy Organization Act (hereafter Energy Act), 42 U.S.C. § 7113, and Section 505 of the Federal Land Policy and Management Act (hereafter FLMPA), 43 U.S.C. § 1765, evince the necessary congressional intent to require WAPA to comply with South Dakota's siting law.[15]
 
 
 37
 Our Supremacy Clause analysis here is controlled by the Supreme Court decisions in Hancock v. Train, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), and E. P. A. v. State Water Resources Control Board, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). These cases involved federal facilities that were emitting pollution in states that required such polluters to obtain state permits. The issue in each case was whether the federal facility had to obtain a permit from the state, or whether compliance with the state's substantive pollution standards alone was sufficient.[16]
 
 
 38
 The Supreme Court in both cases held that federal installations are not required to submit to state regulatory permit procedures absent "clear and unambiguous" congressional authorization. Hancock v. Train, supra, 426 U.S. at 179, 96 S.Ct. at 2012; E. P. A. v. State Water Resources Control Board, supra, 426 U.S. at 211, 96 S.Ct. at 2027. It found that the relevant statutes did not evince a clear and unambiguous intent to require federal installations to obtain state permits,[17] but that they did show a sufficient congressional intent to require the federal agencies to comply with the substantive pollution standards established by the state laws.[18]
 
 
 39
 With the principles articulated in Hancock and E. P. A. in mind, we turn to the Commission's contention that the Energy Act and FLMPA require WAPA to obtain a state siting permit.
 
 
 40
 The relevant language of Section 505 of FLMPA, 43 U.S.C. § 1765, provides:
 
 
 41
 Each right-of-way shall contain-(a) terms and conditions which will * * * (iv) require compliance with State standards for public health and safety, environmental protection, and siting, construction, operation and maintenance of or for rights-of-way for similar purposes if those standards are more stringent than applicable federal standards * * *.
 
 
 42
 The question of whether Section 505 requires a federal power agency to comply with a state energy facility siting act was squarely faced by the Ninth Circuit in Columbia Basin Land Protection Association v. Schlesinger, 643 F.2d 585 (9th Cir. 1981). The Columbia Basin Court, relying on Hancock v. Train, supra, 426 U.S. at 167, 96 S.Ct. at 2006, 48 L.Ed.2d at 555, and E. P. A. v. State Water Resources Control Board, supra, 426 U.S. at 200, 96 S.Ct. at 2022, 48 L.Ed.2d at 578, held that the Bonneville Power Administration (BPA), WAPA's sister agency, was required under FLMPA to comply with Washington's substantive standards, but it need not go through the state certification process or obtain a state siting certificate. Columbia Basin Land Protection Association v. Schlesinger, supra, 643 F.2d at 605.
 
 
 43
 In so holding, the Columbia Basin Court reasoned:
 
 
 44
 Our next inquiry is whether the BPA also must go through the certification process and get a certificate from the Governor. We hold that it does not. The statute refers to standards, it does not mention procedures. As in Hancock, there is no reference here to complying with all of the state's laws, or with all requirements of a permitting system. The Act only refers to standards. The statute never defines the term, nor does its legislative history, but the normal use of the term, and that used by the Supreme Court in Hancock and EPA, is "substantive requirements."
 
 
 45
 Moreover, to require the BPA to receive a state certificate would imply that the state could deny the application, which would give them a veto power over the federal project. This clearly cannot be the meaning that Congress intended. Much stronger language would be needed for us to conclude that Congress was delegating so much power from the federal government to the states. Congress would not delegate such an important function as the decision of whether and where to distribute electric power from federal facilities to total state control in such a brief statement.
 
 
 46
 Id. at 605.
 
 
 47
 We agree with both the Court's holding and its rationale. The Supreme Court's decision in California v. United States, 438 U.S. 645, 98 S.Ct. 2985, 57 L.Ed.2d 1018 (1978), does not, as the Commission argues, require a different conclusion. In that case, the Federal Bureau of Reclamation sought to build a dam in California pursuant to the Reclamation Act, 43 U.S.C. §§ 371 et seq. (1976). The Court held that the Bureau of Reclamation must apply for a state water appropriation permit and it must comply with the conditions set by the state. Id. at 674-675, 98 S.Ct. at 3000-3001. It held that this compliance was required by the clear and unambiguous language of Section 8 of the Reclamation Act, which states:
 
 
 48
 (N)othing in this Act shall be construed as affecting or intended to affect or to in any way interfere with the laws of any State, or Territory relating to the control, appropriation, use or distribution of water used in irrigation, * * * and the Secretary of the Interior, in carrying out the provisions of this Act, shall proceed in conformity with such laws * * *.
 
 
 49
 43 U.S.C. § 383 (emphasis added).
 
 
 50
 This language, unlike the provisions of Section 505 of FLMPA, plainly refers to compliance with all state laws, not merely standards. The Supreme Court indicated that this explicit language is the kind that was absent in Hancock v. Train, supra, 426 U.S. at 182, 96 S.Ct. at 2014, and E. P. A. v. State Water Resources Control Board, supra, 426 U.S. at 212-213, 96 S.Ct. at 2028. See California v. United States, supra, 438 U.S. at 675-676, 98 S.Ct. at 3001.
 
 
 51
 The Supreme Court also premises its decision on this nation's long history of state control of water resources and federal deference to state prerogatives concerning water policies, which the legislative history of the Reclamation Act recognized. Id. The transmission of electrical energy is not marked by the same history of traditional state control. Indeed, existing federal legislation makes it clear that the federal government has played an active role in providing electrical energy. See, e.g., infra, at 1180 - 1181.
 
 
 52
 The remaining statute relied on by the Commission is the Energy Act and, in particular, Section 103, which provides, inter alia:
 
 
 53
 Whenever any proposed action by the Department conflicts with the energy plan of any State, the Department shall give due consideration to the needs of such State, and where practicable, shall attempt to resolve such conflict through consultants with appropriate State officials. Nothing in this chapter shall affect the authority of any State over matters exclusively within its jurisdiction.
 
 
 54
 42 U.S.C. § 7113 (emphasis added).
 
 
 55
 It is clear under the analysis of Hancock and E. P. A. that unless this case falls within the exclusive jurisdiction exception of the last sentence of Section 103, the statute does not require WAPA to comply with the South Dakota siting laws. Besides the exclusive jurisdiction exception, Section 103 is couched in terms of "due consideration," and "where practical * * * attempt to resolve such conflict." This language is far from a clear and unambiguous expression of congressional intent to subject an agency of the federal government to state jurisdiction. Compare California v. United States, supra, 438 U.S. at 675, 98 S.Ct. at 3001. Indeed, the language of Section 103 evinces far less intent to permit state regulation of federal activities than the statutes held not to require federal installations to obtain state permits in Hancock v. Train, supra, 426 U.S. at 179, 96 S.Ct. at 2012; E. P. A. v. State Water Resources Control Board, supra, 426 U.S. at 211, 96 S.Ct. at 2027; and California Basin Land Protection Association v. Schlesinger, supra, 643 F.2d at 604-605.
 
 
 56
 The issue then is does the decision whether and when to construct electrical power transmission facilities, including those of the federal government, fall within the exclusive jurisdiction of South Dakota. It is plain that it does not.
 
 
 57
 The Miles City-New Underwood powerline, authorized and funded by the Energy and Water Development Appropriation Act of 1980, Pub.Law 96-69, 93 Stat. 437, 440 (Sept. 25, 1979), is indicative of the role that the United States is playing in providing electricity to energy consumers. Federal agencies, such as WAPA, Bonneville Power Administration, Tennessee Valley Authority, and others, see 42 U.S.C. § 7152, have been created to implement federal policies and programs aimed at producing and transmitting electrical power. Similarly, in 1944, Congress passed the Flood Control Act, 16 U.S.C. § 825s,[19] which authorized the Secretary of Interior to construct or acquire transmission lines and related equipment necessary for marketing power generated from certain federal installations. Moreover, in passing the Energy Act in 1977, Congress revealed its intent to expand the scope of federal involvement in the energy field. Besides establishing the new cabinet-level Department of Energy, the Act was intended to develop a national policy to deal with short-, mid- and long-range energy problems, and to provide for the cooperation of the federal, state and local governments in achieving energy goals. 42 U.S.C. § 7112.
 
 
 58
 These federal statutes clearly evince a congressional intent not to leave to the states decisions such as whether to build transmission facilities and where to locate them. Nothing in the legislative history of Section 103 of the Energy Act suggests the contrary.
 
 
 59
 The Commission is left with the argument that it has exclusive jurisdiction over the location of this powerline because South Dakota has siting regulations and the federal government has not yet promulgated any. This contention is untenable. The federal government is free to preempt the utilities field entirely. See Federal Energy Regulatory Commission v. Mississippi, --- U.S. ---- - ---- & nn. 29-30, 102 S.Ct. 2127, 2140-2141, & nn. 29-30, 72 L.Ed.2d 532 (1982). The fact that the federal government has not yet promulgated explicit siting regulations does not deprive it of the power to decide whether and where to distribute electrical energy. See id.
 
 
 60
 Accordingly, under the analysis of Hancock and E. P. A., Section 103 of the Energy Act, like Section 505 of FLMPA, does not require WAPA to comply with the procedural requirements of S.D. Codified Laws Ann. § 49-41B, including obtaining a siting permit. The Commission, nonetheless, argues that these federal statutes require WAPA to obtain a state siting permit. It contends that under Hancock and E. P. A., WAPA must comply with the substantive standards of S.D. Codified Laws Ann. § 49-41B, and that the Act's substantive siting standards are inseparable from the law's procedural requirements.[20] According to the Commission, S.D. Codified Laws Ann. § 49-41B only provides a procedural framework for reviewing siting proposals and leaves the substantive standards to be determined on a case-by-case basis through the permit application procedure. The Commission argues that to ensure compliance with S.D. Codified Laws Ann. § 49-41B-22, it must set, as part of any permit, the standards of construction, operation and maintenance which are consistent with the articulated statutory criteria.
 
 
 61
 We must reject the Commission's position.[21] If we held that the substantive standards of S.D. Codified Laws Ann. § 49-41B required WAPA to apply for a state permit, the effect would be to require WAPA to comply with the statute's procedural requirements. We have already concluded that Section 505 of FLMPA, and Section 103 of the Energy Act do not evince the necessary congressional intent to delegate to the states such extensive power over whether or where to distribute electrical power from federal facilities.
 
 
 62
 Moreover, the Supreme Court has already rejected an argument similar to the one advanced here. In Hancock v. Train, supra, 426 U.S. at 180-181, 96 S.Ct. at 2013, the Court stated: "Nor can congressional intention to submit federal activity to state control be implied from the claim that under Kentucky's EPA-approved implementation plan it is only through the permit system that compliance schedules and other requirements may be administratively enforced against federal installations."
 
 
 63
 Finally, if we allowed South Dakota to require WAPA to obtain a state permit because of the structure of its siting law, any state-by adopting a similar statutory scheme-could require federal agencies to fully comply with all substantive and procedural provisions of its laws whenever Congress has directed that its instrumentalities or property be subject to substantive state standards. Such a result is clearly contrary to the holdings of Hancock v. Train, supra, 426 U.S. at 180, 96 S.Ct. at 2013, and E.P.A. v. State Water Resources Control Board, supra, 426 U.S. at 211, 96 S.Ct. at 2027, or any traditional interpretation of the Supremacy Clause.
 
 V.
 
 64
 In summary, we find that the claims of the individual landowners and CLAMP are barred by the doctrine of laches. We also find that, contrary to the contentions of the Commission, the appellees need not obtain a state permit as required by the South Dakota siting law. The judgment of the district court, therefore, is affirmed.
 
 
 
 *
 The Honorable Roy L. Stephenson assumed senior status on April 1, 1982
 
 
 [1]
 Material and equipment for the line were unloaded along the right of way in South Dakota in September and October, 1980. Actual physical construction began in late October. At the time of trial, the line was complete from the South Dakota-North Dakota border to just north of the landowners' property, and because their property was initially passed over, nearly complete from south of their land to WAPA's termination point at New Underwood. The powerline is now complete and in operation
 
 
 [2]
 See, infra, at ----, for a discussion of the landowners' proposals
 
 
 [3]
 The plaintiffs also alleged other violations of state law. They contended that the defendants violated S.D. Codified Laws Ann. §§ 31-26-1 and 31-26-3 by failing to consult with county governments about the location of poles and fixtures. They also claimed the defendants violated S.D. Codified Laws Ann. § 49-41B-3 by failing to submit a ten-year plan to the South Dakota Public Utilities Commission, and violated S.D. Codified Laws Ann. § 49-41B-4.1 by failing to obtain legislative approval for the line
 
 
 [4]
 On April 8, 1981, the landowners and CLAMP moved the district court for a temporary restraining order enjoining construction of the line. The district court issued the temporary restraining order on that date on the condition that the plaintiffs post a $10,000 bond. They did not. On April 11, 1981, the district court denied the plaintiffs' motion for a preliminary injunction. They appealed the denial to this Court, which affirmed the lower court's order and remanded the case for an expedited trial. The trial began on April 28, 1981
 
 
 [5]
 Appellant-landowners are Meade County residents
 
 
 [6]
 One plan, referred to as the Fairpoint alternative, involved routing the line outside of the six-mile study corridor contained in the final EIS. The government officials indicated that this alternative could not be considered because it was outside the six-mile corridor being studied for the EIS. The second alternative suggested rerouting within the six-mile corridor. This plan, however, was unacceptable to several of the landowners that are a party to this suit
 
 
 [7]
 Although we need not consider arguments raised for the first time on appeal, Lewis v. United States Marine Corps, 674 F.2d 714, 717 (8th Cir. 1982), we believe that the appellants' misrepresentation claim does not justify their delay in bringing suit and that it is appropriate in this case to state the reasons for our conclusion
 
 
 [8]
 Although the record does not conclusively show when each of the appellant-landowners first learned of the line's approximate location, it is plain that they all had learned of the proposed corridor by early 1980. For example, Joseph Bruch testified:
 Q. Mr. Bruch, when did you say you first knew this line was coming across your land?
 A. Well, on this deal-
 Q. First when did you know it was going to cross your land?
 A. About the time I signed this petition, mid 1979.
 Q. In August of 1979 is when you signed the petition?
 A. Yes.
 Rex Schreckenghaust stated at trial:
 Q. I think you already testified that it was your understanding that the exact location of that line was pretty well set and not even subject to discussions so far as you were concerned early in 1980, was that your feeling?
 A. In early '80?
 Q. Right.
 A. Yes. It was in '80 when I found out.
 Q. I think your testimony was about six months before the December meeting?
 A. Yeah.
 Q. Sometime in the spring or summer of 1980?
 A. Well, that's when I first saw an exact map of the route?
 Q. As far as you were concerned at that time the exact route had already been taken and it was not going to be changes?
 A. Yes.
 Appellant Floyd Cammack testified that he had knowledge of the proposed construction corridor by spring, 1979. Although the record does not show when the remaining appellant-landowners learned of the proposed corridor, there is no reason to believe that it was significantly later than the others.
 
 
 [9]
 On July 26 and 27, 1980, a WAPA appraiser contacted appellants Cammack, Schreckenghaust, and Joseph and Anthony Bruch. In August and September, 1980, WAPA began easement negotiations with all the appellant-landowners. They received purchase offers from WAPA by letter on the following dates: Floyd Cammack, August 12, 1980; Rex Schreckenghaust, August 13, 1980; Joseph Bruch, October 9, 1980; Henry Bruch, October 9, 1980; Anthony Bruch, October 23, 1980. The record leaves no room for doubt that the landowners knew by this time that the powerline would cross their land
 
 
 [10]
 Andrew Reid, the attorney contacted by Schreckenghaust, testified:
 So there were at least four and possible (sic) six people that I contacted on this question (of whether an administrative appeal was available) in the Department of Energy, including the top people there, and no one was familiar with any environmental appeal regulations in the Department of Energy.
 Q. If there are any regulations, basically you were told there were none?
 A. Correct. And I acted in response to their advice to me and I advised my client accordingly.
 
 
 [11]
 When the hearing was held before the district court in April, 1981, the powerline was 85 percent complete. It was 95 percent complete when the first appeal was taken to this Court
 
 
 [12]
 Because we find that the claims of the landowners and CLAMP are barred by laches, we need not address the district court's alternative holdings that the EIS prepared by WAPA was adequate, and that the agency complied with the National Environmental Policy Act, 42 U.S.C. §§ 4321 et seq., the National Historic Preservation Act, 16 U.S.C. §§ 470 et seq., and the Archaeological Resources Protection Act, 16 U.S.C. § 470aa et seq. Their contention that the appellees violated various provisions of S.D. Codified Laws Ann. §§ 31-26 and 49-41B, supra, at 1174 & n.3, besides being barred by laches, is disposed of by our holding that WAPA need not comply with the state siting law under the Supremacy Clause. Infra, at 1178
 
 
 [13]
 The Act provides that "(n)o utility shall begin construction of a facility in this state * * * without first having obtained a permit" from the Commission. S.D. Codified Laws Ann. § 49-41B-4. The term "facility" includes transmission facilities. Id. at section 49-41B-2(5). The permit requirement expressly applies to "government agenc(ies)." Id. at section 49-41B-2(7)
 
 
 [14]
 The district court also held that the Commission was barred by laches from protesting WAPA's failure to comply with the South Dakota siting law. Laches generally may not be invoked against the government when it acts to enforce a public right or protect a public interest. See United States Immigration & Naturalization Service v. Hibi, 414 U.S. 5, 8, 94 S.Ct. 19, 21, 38 L.Ed.2d 7 (1973). We need not decide whether the circumstances present here would justify the assertion of laches against the Commission because of our holding that the Department of Energy Organization Act, 42 U.S.C. §§ 7101 et seq., and the Federal Land Policy and Management Act, 43 U.S.C. §§ 1701 et seq., do not require WAPA to comply with the South Dakota siting law
 
 
 [15]
 The Commission urges that the Energy Act, 42 U.S.C. §§ 7101 et seq., is relevant here because WAPA is marketing electricity pursuant to the authorization of that Act. 42 U.S.C. § 7152. The Commission relies on FLMPA, 43 U.S.C. §§ 1701 et seq., because it requires WAPA to obtain right-of-way permits from the Bureau of Land Management and the United States Forest Service for the part of the powerline that crosses land under their jurisdiction. 43 U.S.C. § 1765
 
 
 [16]
 In Hancock v. Train, 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), Section 118 of the Clean Air Act, 42 U.S.C. § 1857f, was in controversy. The statute involved in E. P. A. v. State Water Resources Control Board, 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976), was the Federal Water Pollution Control Act Amendments of 1972, and in particular, Section 313, 33 U.S.C. § 1323. Sections 118 and 313 provided that federal installations "shall comply with Federal, State, interstate and local requirements respecting control and abatement of (pollution) to the same extent that any person is subject to such requirements * * *." (Emphasis added.)
 
 
 [17]
 The Court's reasoning in both cases was substantially the same. The Court observed that the statutes referred only to "requirements" rather than "procedures." Moreover, the statutes did not mandate compliance with "all" state and local requirements or laws. Furthermore, the Court found that requiring federal agencies to obtain state permits would have accorded states undue control over federal instrumentalities. The applicable state regulatory schemes empowered the states to deny permits to and forbid operation by an installation even if it complied with all state substantive standards. The Court concluded that it could not find an intent to delegate such power to the states absent a clearer congressional expression in the language or legislative histories of the statutes. See Hancock v. Train, supra, 426 U.S. at 181-198, 96 S.Ct. at 2013-2021; E. P. A. v. State Water Resources Control Board, supra, 426 U.S. at 212-227, 96 S.Ct. at 2028-2035
 
 
 [18]
 Examining the language and legislative history of the Clean Air Act, 42 U.S.C. § 1857f, and the Federal Water Pollution Control Act, 33 U.S.C. § 1323, the Supreme Court found in each case that the statutory term "requirements" was synonymous with "standards," and that "standards" meant state-established emission and effluent levels. Hence, the Court concluded that pollution from federal installations could not exceed the emission or effluent levels set by the state. Hancock v. Train, supra, 426 U.S. at 189, 96 S.Ct. at 2017; E. P. A. v. State Water Resources Control Board, supra, 426 U.S. at 215-216, 96 S.Ct. at 2029-2030
 
 
 [19]
 These functions of the Secretary of Interior under 16 U.S.C. § 825s were transferred to the Secretary of Energy as part of the creation of the Department of Energy. 42 U.S.C. § 7152
 
 
 [20]
 Under S.D. Codified Laws Ann. § 49-41B-22, an applicant for a permit is required to show that:
 (1) The proposed facility will comply with all applicable laws and rules;
 (2) The facility will not pose a threat of serious injury to the environment nor to the social and economic condition of inhabitants or expected inhabitants in the siting area;
 (3) The facility will not substantially impair the health, safety, or welfare of the inhabitants; and
 (4) The facility will not unduly interfere with the orderly development of the region with due consideration having been given the views of governing bodies of affected local units of government.
 These four "burdens of proof" serve as the basis of the Commission's inquiry in its review of an application. No precise standards for construction, operation, or maintenance of the facility are set by statute. Such standards are prescribed by the Commission on a case-by-case basis depending on the record established in each case. Standards are set by the Commission in the form of terms and conditions to the permit for the construction, operation and maintenance of the proposed facility.
 
 
 [21]
 Because we find that WAPA need not obtain a permit from the Commission even if it must comply with the substantive standards of S.D. Codified Laws Ann. § 49-41B, we do not have to decide whether Congress, in fact, intended in the Energy Act, 42 U.S.C. § 7113, and FLMPA, 43 U.S.C. § 1765, to direct federal agencies to comply with the substantive provisions of state laws such as S.D. Codified Laws Ann. § 49-41B