**UNITED STATES of America, Plaintiff,**

v.

**CPS CHEMICAL COMPANY, INC., Defendant.**

**No. J–C–90–43.**

United States District Court, E.D. Arkansas, Jonesboro Division.

Nov. 12, 1991.

Miriam L. Chesslin, Dept. of Justice, Land & Natural Resources Div., Washington, D.C. and Floyd Mac Dodson, U.S. Atty's Office, Little Rock, Ark., for U.S.

Charles R. Nestrud, Chisenhall, Nestrud & Julian, Little Rock, Ark., for CPS Chemical.

## MEMORANDUM OPINION

SUSAN WEBBER WRIGHT, District Judge.

The United States seeks civil penalties and injunctive relief against CPS Chemical Company, Inc. (CPS) for persistent discharge of pollutants into navigable waters in violation of Sections 301 and 402 of the Clean Water Act, 33 U.S.C. §§ 1311 and 1342, the conditions and limitations of the

National Pollutant Discharge Elimination System (NPDES) permit issued to CPS in August 1984 by the United States Environmental Protection Agency (EPA), and the terms of five administrative orders issued by the EPA during the life of the 1984 permit. The government moves for partial summary judgment on the issue of CPS' liability for these violations. For the reasons set forth below, the Court finds that the motion should be and hereby is granted.

## I.

The objective of the Clean Water Act (the Act) is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251 (1982). Section 301(a) of the Act, 33 U.S.C. § 1311(a), makes unlawful "the discharge of any pollutant by any person" into navigable waters of the United States except as otherwise permitted under certain enumerated sections of the Act.[1] This prohibition significantly changed prior federal water pollution law:

> This section [§ 301] clearly establishes that the discharge of pollutants is unlawful. Unlike its predecessor program which permitted the discharge of certain amounts of pollutants under the conditions described above, this legislation would clearly establish that no one has the right to pollute—that pollution continues because of technological limits, not because of any inherent right to use the nation's waterways for the purpose of disposing wastes.... The Committee believes it is important to clarify this point: no one has the right to pollute.

S.Rep. No. 414, 92nd Cong., 1st Sess. 64, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3709. *See EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976).

A "discharge of a pollutant" is defined, in applicable part, as "any addition of any pollutant to [the waters of the United States] from any point source." 33 U.S.C. § 1362(12)(A). The term "pollutant" is broadly defined to include, among other things, solid waste, solid waste, industrial, municipal, and agricultural waste, sewage sludge, biological or radioactive materials, wrecked or discarded equipment, heat, rock, sand, and cellar dirt. *Id.* § 1362(6). A "point source" is "any discernible, confined and discrete conveyance." *Id.* § 1362(14).

There is a critical exception to the Act's basic do-not-pollute rule. The discharge of pollutants is permitted if the source obtains and complies with a permit that limits the amounts and kinds of pollutants which can lawfully be discharged. The cornerstone of this scheme is the National Pollution Discharge Elimination System (NPDES) permit program, established under the Federal Water Pollution Control Act Amendments of 1972. *See* 33 U.S.C. § 1342. As the United States Court of Appeals for the District of Columbia Circuit indicated in *National Resources Defense Council v. USEPA,* 822 F.2d 104 (D.C.Cir.1987):

> The first principle of the statute is ... that it is unlawful to pollute at all. The Clean Water Act does not permit pollution whenever that activity might be deemed reasonable or necessary; rather, the statute provides that pollution is permitted only when discharged under the conditions or limitations of a [NPDES] permit.

*Id.* at 123. Thus, the Act allows the discharge of pollutants from a point source only in compliance with limitations established in the Act.

Sections 301 and 304 of the Act, 33 U.S.C. §§ 1311(b) and 1314(b), which were added by amendment in 1972, direct the EPA to incorporate into the permits in-

---

1. The statutory framework of the CWA has been detailed by the Supreme Court in *EPA v. Nat'l Crushed Stone Ass'n,* 449 U.S. 64, 101 S.Ct. 295, 66 L.Ed.2d 268 (1980), and *E.I. DuPont de Nemours & Co. v. Train,* 430 U.S. 112, 97 S.Ct. 965, 51 L.Ed.2d 204 (1977), and by circuit courts in *Natural Resources Defense Council v. USEPA,* 915 F.2d 1314 (9th Cir.1990), *Chemical Manufacturers Ass'n v. USEPA,* 870 F.2d 177 (5th Cir.1989), *Natural Resources Defense Council v. USEPA,* 822 F.2d 104 (D.C.Cir.1987), and *American Petroleum Institute v. EPA,* 661 F.2d 340 (5th Cir.1981).

creasingly stringent technology-based effluent limitations.[2] These technology-based effluent limitations, as their name suggests, derive from standards formulated with reference to pollution control technology. *See id.* § 1314(b). Dischargers are required to use progressively more advanced technology.

Under the 1972 amendments, section 301(b)(1)(A) directed the EPA to establish effluent limitations requiring "the application of the best practicable control technology currently available," known as the "BPT" standard, which dischargers were to have met by July 1, 1977. The 1977 amendments made the standard applicable in a particular case depend in part on the type of pollutant—toxic, conventional, or nonconventional. *See id.* §§ 1362(13) (toxic pollutants), 1314(a)(4) (conventional pollutants), 1311(b)(2)(F) (other pollutants which are neither toxic nor conventional).[3] Section 301(b)(2)(E) directed the EPA to establish effluent limitations for conventional pollutants to have been met not later than July 1, 1984, requiring dischargers to achieve effluent reductions in conventional pollutants that reflect application of the "best conventional pollutant control technology," known as the "BCT" standard. Section 301(b)(2)(A) and (F), elevated the BPT standard even further, requiring the dischargers to have begun applying the "best available technology economically achievable," known as the "BAT" standard, to listed toxic pollutants by July 1, 1984, and to all other (nonconventional) pollutants by July 1, 1987. Section 304(b) set the technical criteria for determining effluent reductions attainable under BPT and BAT.

Congress again amended portions of the Act in 1987 to extend compliance dates prescribed in the 1977 amendments from July 1, 1984 to March 31, 1989, to permit modification of effluent limitations for certain specified "nonconventional" pollutants, to alter the guidelines applicable to facilities that are fundamentally different, and to effect other changes. References in this opinion to the Act refer to its provisions before the 1987 amendments.

In short, the statutory scheme is structured around a series of increasingly rigorous technology-based standards, beginning with implementation of the best "practicable" technology (BPT) and progressing toward implementation of pollution controls to the full extent of the best technology available (BAT). "Thus, the most salient characteristic of this statutory scheme, articulated time and again by its architects and embedded in the statutory language, is that it is *technology-forcing.*" *Natural Resources Defense Council v. USEPA,* 822 F.2d 104, 123 (D.C.Cir.1987) (citing S.Rep. No. 414, 92d Cong., 1st Sess. 42, *reprinted in* 1972 Legislative History at 1460; 117 Cong.Rec. 38,808 (1971) (Sen. Montoya), *reprinted in* 1972 Legislative History at 1278; 118 Cong.Rec. 33,693, 33,696, (1972) (Sen. Muskie), *reprinted in* 1972 Legislative History at 163, 170; *Tanners' Council v. Train,* 540 F.2d 1188, 1195 (4th Cir. 1976)) (emphasis added).

NPDES permits are issued by the EPA (or by a state if the permitting program is delegated) for fixed terms not to exceed five years. 33 U.S.C. § 1342(b)(1)(B). Permits are written on a facility-specific basis and impose effluent limitations on the discharge of specific pollutants in the facility's wastestream. The NPDES permits thus "transform generally applicable effluent limitations and other standards ... into the obligations (including a timetable for compliance) of the individual discharger." *EPA v. National Crushed Stone Ass'n,* 449 U.S. 64, 70, 101 S.Ct. 295, 300, 66 L.Ed.2d 268 (1980) (quoting *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 205, 96 S.Ct. 2022, 2025, 48 L.Ed.2d 578 (1976)). All dischargers are required to obtain a permit, which is issued after public notice and an

---

**2.** Effluent limitations consist of restrictions on quantities, rates, or concentrations of pollutants and compliance schedules for the achievement of such restrictions. *See* 33 U.S.C. § 1362(11).

**3.** All other pollutants that have not been classified as conventional or toxic are generally referred to as "nonconventional/nontoxic" pollutants. *American Petroleum Institute v. EPA,* 787 F.2d 965, 970 n. 5 (5th Cir.1986).

opportunity for public hearing. 33 U.S.C. § 1342(a)(1), (b)(3).

The 1972 amendments required the EPA to develop minimum technology-based effluent guidelines on an industry-by-industry basis, to be applied nationwide to all dischargers in specified industrial subcategories. If no national standards have been promulgated for a particular category of point sources, the permit writer is authorized to use, on a case-by-case basis, his "best professional judgment" (BPJ) to incorporate "such conditions as the [EPA] determines are necessary to carry out the provisions of the Act." *Id.* § 1342(a)(1). Thus, "compliance with a permit is generally deemed to constitute compliance with the Act's requirements." *Natural Resources Defense Council,* 822 F.2d at 111 (citing 33 U.S.C. § 1342(k)).

Section 509(b) of the Act, 33 U.S.C. § 1369(b), sets forth an exclusive statutory scheme for review of allegedly unreasonable NPDES permit limits. Judicial review of permit conditions is only by petition to the United States Court of Appeals for the circuit in which the permittee resides or does business. The statutory right to review by the court of appeals of NPDES limitations arises at the time of the issuance of the permit. Until 1987, such petitions were required to be filed within 90 days of issuance of the permit. In 1987 Section 509(b)(1) was amended to enlarge this time to 120 days. Section 509(b)(2), by its terms, precludes judicial review of permit limits in proceedings brought for their enforcement. Enforcement proceedings must be brought in the United States District Court in the district in which the permittee is located or doing business. 33 U.S.C. § 1319(b), (d).

EPA regulations implementing the Act contain procedures for modifying existing NPDES permits during their five-year terms, upon either the EPA's initiative or application by the permittee.[4] All modification requests must be in writing and contain facts or reasons supporting the request. 40 C.F.R. § 124.5. NPDES permits can be modified only for the reasons specified in 40 C.F.R. § 122.62(a), which include, among other things, substantial alterations or additions to the permitted activity or facility that occur after permit issuance and justify conditions different from or absent in the original permit, and the permittee's filing of a timely request for a variance under sections 301(c), (g)-(i), (k), or 316(a), or for "fundamentally different factors".

Section 301(n) of the Act, 33 U.S.C. § 1311(n), provides for variances from the requirements of national effluent limitation guidelines, if the discharger to whom the guidelines would apply is able to demonstrate to the EPA that its facility or circumstances are "fundamentally different" from the factors the EPA considered in developing the industry-wide standards through national rulemaking.[5] To implement this statute, EPA regulations prescribe specific criteria and procedural rules for processing such "fundamentally different factor" (FDF) variance applications. *See* 40 C.F.R. §§ 125.31 (criteria), 124.62 *et seq.* (procedural rules), 124.10 *et seq.* (same).

The effluent limitations set forth in an NPDES permit are ordinarily drafted in terms of limitations on the amount, rate, or concentration of a specific pollutant. Permits may also include limitations on key generic parameters, such as pH or biochemical oxygen demand (BOD). Permits

---

**4.** 40 C.F.R. § 122.62 provides for modification of an existing NPDES permit:

> [w]hen the [Regional] Director receives any information (for example, inspects the facility, receives information submitted by the permittee as required in the permit (see § 122.-41), receives a request for modification or revocation and reissuance under § 124.5, or conducts a review of the permit file), he or she may determine whether or not one or more of the causes listed in paragraphs (a) or

> (b) of this section for modification or revocation and reissuance or both exist. If cause exists, the Director may modify or revoke and reissue the permit accordingly....

**5.** The rationale for fundamentally different factor (FDF) variances is explained in *Chemical Manufacturers' Ass'n v. NRDC,* 470 U.S. 116, 105 S.Ct. 1102, 84 L.Ed.2d 90 (1985), which upheld the EPA's authority to grant FDF variances for toxic substances in point source discharges.

generally include other provisions, such as monitoring and reporting requirements, compliance schedules, and management practices. *See* 33 U.S.C. §§ 1314, 1318, 1342(a)(2). Section 308 of the Act, 33 U.S.C. § 1318, requires each permittee to establish and maintain records, to install and maintain monitoring equipment, to sample and monitor its effluent according to a prescribed schedule, and to report the results to the permitting agency. The monthly reports, which are submitted on standard EPA-prescribed forms, are known as Discharge Monitoring Reports (DMRs). *See* 40 C.F.R. §§ 122.41(j) and 122.48.

■ Compliance monitoring and enforcement by the EPA are based primarily on the self-monitoring requirements in permits and the information in the DMRs permittees are required to submit. The DMRs must be signed by a responsible corporate officer, who certifies that the reported information was prepared by qualified personnel under his or her direction or supervision and that the information is true, accurate, and complete. 40 C.F.R. § 122.22. A permittee who submits inaccurate or false data is subject to civil penalties or criminal prosecution pursuant to section 309(c) and (d) of the Act, 33 U.S.C. § 1319(c), (d). Thus, "a discharger must report its own permit violations should they occur." *Student Public Interest Research Group v. Fritzsche, Dodge & Olcott,* 579 F.Supp. 1528, 1531 (D.N.J.1984), *aff'd,* 759 F.2d 1131 (3d Cir.1985).

■ Enforcement of the Clean Water Act is intentionally straightforward. Section 309(a)(3) of the Act, 33 U.S.C. § 1319(a)(3), gives the EPA two options upon finding a violation of the permit conditions: first, issue a compliance order, or second, file a suit for enforcement. *See Hoffman Group, Inc. v. EPA,* 902 F.2d 567, 569 (7th Cir.1990). Compliance with the Act is a matter of strict liability and a permittee's intention to comply or a good faith attempt to do so does not excuse a violation. *See, e.g., Stoddard v. Western Carolina Regional Sewer Authority,* 784 F.2d 1200, 1208 (4th Cir.1986); *United States v. Earth Sciences,* 599 F.2d 368, 374

(10th Cir.1979); *Connecticut Fund for the Environment, Inc. v. Upjohn Co.,* 660 F.Supp. 1397, 1409 (D.Conn.1987); *Connecticut Fund for the Environment, Inc. v. Job Plating Co.,* 623 F.Supp. 207, 218 (D.Conn.1985); *Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 608 F.Supp. 440, 451–53 (D.Md.1985); *United States v. Amoco Oil Co.,* 580 F.Supp. 1042, 1050 (W.D.Mo.1984). The legislative history of the Act reveals that Congress intended to keep enforcement actions simple and speedy:

> [o]ne purpose of the [monitoring] requirements is to avoid the necessity of lengthy fact finding, investigations, and negotiations at the time of enforcement. Enforcement of violations of requirements of this Act should be based on relatively narrow fact situations requiring a minimum of discretionary decision making or delay.

S.Rep. No. 414, 92d Cong., 1st Sess. 64, *reprinted in* 1972 U.S.C.C.A.N. 3668, 3730. Elsewhere, the Senate Report states: "[T]he factual basis for enforcement of requirements would be available at the time enforcement is sought, and the issue before the court would be a factual one of whether there had been compliance." *Id., reprinted in* 1972 U.S.C.C.A.N. 3668, 3746.

■ For enforcement purposes, a permittee's DMRs constitute admissions regarding the levels of effluents that the permittee has discharged. *United States v. City of Hoboken,* 675 F.Supp. 189, 192 (D.N.J.1987). The DMRs may be used to establish the permittee's liability under the Act by showing that the permittee has exceeded its NPDES permit limitations. *See, e.g., Atlantic States Legal Foundation, Inc. v. Tyson Foods, Inc.,* 897 F.2d 1128, 1135 (11th Cir.1990); *Sierra Club v. Union Oil Co.,* 813 F.2d 1480, 1491–92 (9th Cir. 1987); *Sierra Club v. Simkins Industries, Inc.,* 847 F.2d 1109, 1115 n. 8 (4th Cir.1988); *Student Public Interest Research Group v. Fritzsche, Dodge & Olcott,* 579 F.Supp. 1528, 1538 (D.N.J.1984), *aff'd on other grounds,* 759 F.2d 1131 (3d Cir.1985); *City of Hoboken,* 675 F.Supp. at 192; *Chesapeake Bay,* 608 F.Supp. at 451–52; *Stu-*

*dent Public Interest Research Group v. Monsanto Co.*, 600 F.Supp. 1479, 1485 (D.N.J.1985). Accordingly, courts have granted summary judgment on the issue of liability based on a reading of a defendant's DMRs. *See, e.g., City of Hoboken*, 675 F.Supp. at 192–194; *Connecticut Fund for the Environment, Inc. v. Upjohn Co.*, 660 F.Supp. at 1409; *Student Public Interest Research Group v. Georgia–Pacific Corp.*, 615 F.Supp. 1419, 1429–31 (D.C.N.J.1985); *Chesapeake Bay*, 608 F.Supp. at 452.

## II.

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Summary judgment "correctly results from the application of substantive law to facts established beyond reasonable controversy," *Woodsmith Publishing Co. v. Meredith Corp.*, 904 F.2d 1244, 1247 (8th Cir.1990), but should not be granted if a fair-minded jury could return a verdict for the nonmoving party on the evidence presented, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

The moving party bears the burden of setting forth facts to show that he is entitled to a judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The burden then shifts to the nonmovant to demonstrate that there exists a genuine issue as to material fact, and "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2514.

A moving party also is entitled to summary judgment, after adequate time for discovery and upon motion, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at tri-

al." *Lujan v. National Wildlife Federation*, — U.S. —, 110 S.Ct. 3177, 3186, 111 L.Ed.2d 695 (1990) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986)). In such instances, there is no genuine issue of material fact, "since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553. The moving party is not required to produce evidence showing the absence of a genuine issue of material fact; rather, the moving party's burden "may be discharged by 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the nonmoving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. *See Lujan*, 110 S.Ct. at 3187 (movant not required to negate elements of nonmovant's case).

In deciding whether to grant summary judgment, the court must view the facts in the light most favorable to the nonmoving party, giving that party the benefit of all reasonable inferences drawn from the facts. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986); *Woodsmith Publishing*, 904 F.2d at 1247. Nevertheless, a party opposing a properly supported motion for summary judgment "may not rest upon the mere allegations or denials" of its pleadings, but must go beyond the pleadings and by affidavits, or by "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be "outcome determinative" under applicable law. *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir.1989); *Twin City Bank v. Verex Assurance, Inc.*, 733 F.Supp. 67, 67–68 (E.D.Ark.1990).

## III.

The facts necessary to support a finding of liability in this case are not in dispute. In 1981 CPS Chemical Company, a private-

ly held New Jersey corporation which manufactures specialty organic chemicals, purchased a plant in West Memphis, Arkansas, from the Vertac Corporation (Vertac). Following acquisition of the West Memphis facility, CPS began replacing Vertac's agricultural chemical and pesticide products with its own product line, cationic water base monomers and polymers, which are used for treatment of industrial wastewater and potable water. Municipalities use CPS' products to purify water supplies in order to meet regulatory standards for drinking water.

CPS operated under Vertac's NPDES permit for the facility until 1984, when it applied for and was issued a new NPDES permit by EPA Region VI. The permit was effective as of August 30, 1984, for a five-year term. By the time CPS was issued the new permit, CPS had substantially replaced the Vertac product line with its own specialty chemical products. The 1984 permit authorized CPS to discharge process wastewater and contaminated stormwater runoff into the Mississippi River, subject to specified daily average and daily maximum limitations for listed effluents, including Biochemical Oxygen Demand ($BOD_5$), Chemical Oxygen Demand (COD), Total Organic Carbon (TOC), Total Suspended Solids (TSS), Total Purgeable Aromatics (TPA), 4–6–dinitro–ortho–cresol (DNOC), and phenoxyacetic acid.[6] Each of these regulated effluents are "pollutants" within the meaning of Section 311(a) of the Clean Water Act, 33 U.S.C. § 1321(a).

Since the EPA, at that time, had not promulgated final technology-based effluent guidelines for the organic chemical industry, CPS' 1984 permit was written on a best professional judgment (BPJ) basis. In developing the effluent limitations, the EPA Region VI permit writer considered CPS' then-current products and processes, as well as information about its existing wastewater treatment system and the engineering and cost aspects of achieving the effluent reductions required by the applicable technology-based statutory criteria.

*See* Aff. of John A. Rowe, Jr., Exhibit 5 (Permit Fact Sheet). CPS' limits were based on facility-specific information and the appropriate regulatory standards for determining limits actually achieved by similar industrial dischargers with well-designed and operated wastewater treatment systems. *Id.;* Dep. of Robert K. Franke at 11–25. Although the EPA took into account the *proposed* industry-wide guidelines for the organic chemicals industry, which were published for public comment in early 1983, 48 Fed.Reg. 11828 (March 21, 1983), these proposed guidelines were not applied across the board. $BOD_5$ TSS, and DNOC were the only parameters covered by the proposed industry guidelines. The permit writer applied the upper end of a broad range of proposed guideline standards in setting CPS' $BOD_5$ limit. As to TSS, the permit writer did not apply the proposed guidelines, but instead retained the TSS limits in the previous 1981 permit. *See* Decl. of Elwood H. Forsht, ¶¶ 5 and 6. Using his best professional judgment, the permit writer determined that the limits were achievable, both technologically and economically, even though compliance would require CPS to upgrade its treatment technology. Franke Dep. at 26–32, 38, 41. CPS did not submit comments to the EPA on the draft permit during the public comment period, as provided for in 40 C.F.R. § 124.11, and did not seek judicial review of the final permit pursuant to Section 509(b) of the Act, 33 U.S.C. § 1369(b).

The 1984 permit required CPS to submit certified DMRs on a monthly basis to EPA Region VI. These DMRs reflect the results of CPS' monitoring of its effluent wastewater for each of the constituents or "parameters" regulated by its permit. Each of the DMRs submitted during the term of the 1984 permit was signed by the Plant Manager of CPS' West Memphis facility or his authorized representative, who certified the accuracy of the monitoring results and other information in the reports.

---

**6.** The DNOC parameter was related to production of the only Vertac product continued by CPS after it acquired the West Memphis facility.

CPS discontinued this product at the end of 1986. Decl. of Robert J. Goodfellow ¶ 12 n. 4.

CPS' DMRs were submitted on standard EPA forms, which require reporting of the daily maximum and daily average limitations for each regulated parameter and the actual quantity and quality of each regulated effluent discharged in the course of the preceding month's operations. According to Mr. Robert J. Goodfellow, Compliance Officer in the Enforcement Branch of the Water Management Division at the EPA, Region VI, in 62 of the 63 months of the permit's term,[7] CPS reported exceedances of the daily average and/or daily maximum limitations in its permit or in various administrative orders (discussed below) which gave it less stringent "interim" limitations. Decl. of Robert J. Goodfellow, ¶ 6. During this period, there were over 1700 violations of daily maximum limitations and over 200 violations of daily average limitations for the various parameters regulated by the permit. *Id.* The number and magnitude of these violations increased significantly in late 1986 and early 1987. *Id.* ¶¶ 6, 7.

The magnitude of CPS' exceedances range from two to four times the allowable pounds per day limits for various parameters in the early years of the permit and climb steadily upward, to five, six, and seven times the allowable daily limits in late 1986 and early 1987, to as high as 15 to 25 to 45 times the allowable pound per day limits in 1988 and 1989. By comparison, the EPA's criteria for evaluating violations mandate formal enforcement action when a permittee exceeds its daily average limitations by a multiple (or factor) of 1.4 for conventional parameters such as $BOD_5$, COD, TOC, and TSS, as infrequently as twice in six months. *Id.* ¶ 7.

The 1984 permit also required CPS to give advance notice to the EPA "of any planned changes in the permitted facility or activity which may result in noncompliance with permit requirements." *Id.* ¶ 8. In meetings with and reports to the EPA in early 1987, CPS indicated that between mid–1982 and mid–1984, production at the

West Memphis facility had increased by 245%, and that the 1987 production level would exceed the 1982 level by approximately 400%. *See* United States' Memorandum in Opposition to CPS' Motion for a Stay, Exhibit 1. EPA enforcement staff confirmed this information in a site visit in March 1987, and notified CPS that this significant increase in production without prior notification to the EPA was a violation of permit conditions and formed the basis for additional enforcement action. Goodfellow Decl. ¶ 13. In a letter to the EPA dated July 22, 1988, John (Jack) A. Rowe, Jr., Vice–President for Operations at CPS, indicated that

> CPS reported to the EPA and to the ADPCE [Arkansas Department of Pollution Control and Ecology] in correspondence dated January 30, 1987, February 2, 1987, and April 29, 1988 that production at the subject facility has continued to increase uniformly and steadily, and that limits based on the original standard of 52,000 gallons per day of effluent are totally unrealistic and restrictive to normal growth. Actual production figures for the period in question show a 400% increase from January, 1984 to the current period. A similar increase had been observed and noted in earlier correspondence from 1982 to early 1987.

United States' Motion for Partial Summary Judgment on Liability, Exhibit 3.

For the first six months of operation under its 1984 permit, CPS reported relatively low-level exceedances of the $BOD_5$, COD, and TOC limitations, and more substantial exceedances of the DNOC limitation, which apparently were related to a former Vertac product which CPS discontinued at the end of 1986. Based on these exceedances, EPA Region VI issued its first administrative compliance order to CPS on April 3, 1985. To give CPS a reasonable time to comply with the more rigorous standards in the new permit, this first administrative order allowed CPS

---

7. Although the stated expiration date for the 1984 permit was August 29, 1989, the effective date of CPS' subsequent permit was December 1, 1989. Pursuant to 40 C.F.R. § 122.6, where a permittee has made timely application for a

new permit, its existing permit is extended administratively until issuance of the new permit. Since CPS made timely application for its 1989 permit, its 1984 permit limits were extended until issuance of the new permit.

ninety days to eliminate and prevent recurrence of the noncomplying discharges and to submit a report detailing the actions taken to achieve compliance. In the event compliance within this period was not possible, CPS was ordered to submit a comprehensive plan and critical path schedule for achieving compliance within the shortest time possible. The new permit was based on BCT standards, a more stringent level of technology which the Act required to be implemented by July 1, 1984. On the enforcement side, the EPA, recognizing that compliance might require upgrading dischargers' treatment systems, issued administrative orders with compliance schedules or interim limits to assist permittees to achieve the statutorily required levels of treatment. Franke Dep. at 17–18, 54.

In response to this order, CPS submitted a report in July 1985 asserting that its actions had resulted in compliance, or near compliance, with all permit parameters except DNOC, and that its studies had indicated a high probability that the DNOC limit could be met through optimization of the biology of the existing system. Accordingly, CPS proposed a critical path schedule and further suggested that

the [DNOC] limitation should not be changed at this time, but rather continued efforts should be made to reach practical levels available through the best use of the existing system operating in an activated sludge mode. It is requested that CPS be given until January 1, 1986, to optimize the operation of the existing system through biological seeding. If, at the end of this period, it is demonstrated that the DNOC limitation cannot be met, an appropriate modification could be made to the permit on the basis of the actual performance data.

CPS' Response to Motion for Partial Summary Judgment on Liability, Exhibit 18 [hereafter Defendant's Exhibit]. In January 1986 CPS submitted its compliance report to the EPA. *See* Defendant's Exhibit 26. CPS indicated that it had implemented numerous inplant and end-of-pipe treatment improvements, but had not yet achieved compliance with the COD, DNOC, and TOC limitations. Such exceedances were believed to be caused by relatively high DNOC concentrations and resultant inhibition of biological activity. CPS asked the EPA to consider issuing a revised permit with interim effluent limitations, defer issuance of final effluent limitations until industry-wide affluent limits had been promulgated or until CPS completed additional studies on the effluent quality that could be obtained with additional proposed controls on DNOC, or issue a revised administrative order containing a specified schedule for attaining compliance with final affluent limitations.

At this time, CPS apparently understood that the results of these studies would be used in establishing new final affluent limitations to be issued in a new administrative order which would include a compliance schedule, and that these new final limitations would then be incorporated into a new NPDES permit as the federal regulations and timing would allow. Defendant's Exhibit 28.[8] Regarding the issuance of a new permit, CPS would "pursue the possibility of obtaining a Fundamentally Different Factors determination relative to our DNOC limitations and possibly other parameters." *Id.* Shortly thereafter, on February 28, 1986, the EPA issued its second administrative order which set less stringent "interim" limitations[9] for COD,

8. This exhibit is a letter dated February 4, 1986 to the EPA from CPS' plant manager at the West Memphis facility, apparently following up a January 22, 1986 meeting between EPA and CPS officials. Mr. Robert Franke, the EPA permit engineer, attended this meeting and testified at his deposition that the letter is inaccurate to the extent it suggests that EPA officials promised at the meeting that CPS would get new limits, because the EPA officials would lack the authority to make such a commitment at that time. Franke Dep. at 73. However, Mr. Franke said

that it would not have been unreasonable for the EPA officials to have indicated that they would *consider* permit modification with new data. *Id.*

9. "Interim" limitations in administrative orders do not modify or amend the final permit limits, but rather allow the permittee to continue in operation so long as it is making reasonable efforts to achieve compliance with the permit limits. Interim limits, in effect, represent an exercise of the EPA's discretion not to prosecute

TOC, and DNOC. The order also required submission of further, detailed reports on CPS' studies to control the discharge of DNOC and, ultimately, attain compliance with all parameters.

By mid–1986 CPS reported consistent exceedances of the less stringent interim limits, as well as the $BOD_5$ and TSS limits in its original permit, as to which there were no interim limits set. Accordingly, on August 29, 1986, the EPA issued its third administrative order, which required CPS to take corrective action for $BOD_5$ and TSS compliance within thirty days, and to submit by January 1, 1987 of a financial analysis and implementation plan for the technology necessary to remove the DNOC, as well as a critical path schedule for achieving compliance.

In its report filed on January 30, 1987 in response to this order, CPS disclosed (as discussed above) that its production from mid–1982 to mid–1984 increased by 245% and that its current level of production in 1987 would exceed its 1982 levels by 400%. The report shows that CPS was aware that the draft permit issued in 1984 called for drastic reductions in effluents based on an unchanged flow of 52,000 gallons per day, and states:

> Our concern over these proposed drastic reductions in the face of our expanding production was conveyed separately to Mr. Rob Franke, who was instrumental in composing the 1984 Draft Permit, and to Mr. Bruce Varner, the Enforcement Officer.
>
> In view of the fact that no categorical standards exist for our industry, both individuals responded to the effect that we should not be concerned over the new limits as long as we were moving forward with a positive approach toward improving treatability.

Defendant's Exhibit 42. CPS also reported that its studies indicated that the two DNOC treatment options, granular activated carbon (GAC) and ozonation, would eliminate the DNOC, but neither would bring the wastewater into compliance with permit limits for other effluents. CPS suggested that "[a]t current production levels, it is imperative that the plant be allowed to discharge increased levels of all regulated parameters in keeping with the increased flows and loadings that must result," and asked for new DMR limits under either treatment option based on 100,000 gallons per day discharge. *Id.*[10]

In a letter to E.H. Forsht of the EPA dated February 2, 1987, Jack Rowe summarized CPS' position with respect to the 1984 permit. *See* Defendant's Exhibit 60A. He indicated that its studies showed that its system was fundamentally different and does not respond to conventional treating technology. Specifically, he said that (1) no technique had yet been found to develop biological activity in a conventional activated sludge environment at the West Memphis facility, (2) granular activated carbon (GAC) and ozone will remove DNOC, but have minimal effect on COD, TOC, TSS, and $BOD_5$, (3) removal of DNOC does not improve biological activity, and (4) the GAC system and the ozone system will "impose a very large financial burden on the plant" with little effect on effluents except DNOC. The letter also stated that CPS "has no choice but to go on record that we must oppose [the 1984 permit] limits and use our best efforts to have them modified." In addition, Mr. Rowe indicated that

> [a]t such time as Categorical Standards are issued for the Organic Chemicals and Plastics and Synthetic Fibers Industry, CPS contends that the West Memphis,

---

violations of the permit limits so long as the discharger is in compliance with the interim limits and the other conditions in the administrative order. Goodfellow Decl. ¶ 10 n. 4.

**10.** In a section entitled "Recommended Alternate Approach," the report states:

> This plant is approaching a level of production which can allow further growth and expansion in an area of high unemployment

and depressed industrial activity. Large monetary outlays for marginal improvement in effluent quality will delay this expansion.

This section then proposes that, if the existing administrative order is rescinded, CPS would finance detailed research on whether the use of special mutant strains ("super bugs") would result in improved effluent composition.

Arkansas facility will be a candidate for a Fundamentally Different Factor classification and such relief as may be accorded under that designation.

In late 1986 and early 1987, CPS' DMRs showed a dramatic increase in the number and magnitude of exceedances of interim and original permit limits for *all* parameters in question. In February 1987 CPS met with representatives of the Arkansas Department of Pollution Control and Ecology (ADPC & E) to discuss a permit modification based on production volume.[11] *See* Defendant's Exhibit 49. On February 27, 1987, the EPA issued its fourth administrative order, citing CPS for violation of all the interim and original permit limits, for failure to report measurement frequencies and sampling types, for an untimely response to the previous administrative order, and for submission of a critical path schedule for DNOC compliance only, rather than for all parameters.[12] The order required CPS to submit a report identifying the claimed "inhibitors" of its biological treatment system by October 15, 1987, as well as quarterly reports documenting its efforts to comply with all permit limits. In addition, CPS was given until June 1, 1988 to complete construction of technology that would control the identified "inhibitors" and attain continuous and complete compliance. The order also set new, higher interim limits for all parameters in question.

By mid-1987 CPS' DMRs reported regular exceedances, at increasing levels of magnitude, of all final and interim $BOD_5$, COD, TOC, and TSS limitations. On December 10, 1987, the EPA issued its fifth and last administrative order, citing CPS for all recent effluent violations, for doubling its discharge in December 1986 without prior notice to the EPA, and for failure to provide the reports specified in the previous order which, among other things, required documentation of the additional

technology needed to control the purported inhibitors of its treatment system. The order also directed CPS to show cause why further enforcement action should not be taken for its persistent violations.

In response to this administrative order, CPS again submitted written materials summarizing various studies and efforts to achieve DNOC compliance and, in a January 14, 1988 letter from the plant manager of the West Memphis facility, indicated that "the existing permit limits as written cannot be achieved with any technology currently known or available to our company." Defendant's Exhibit 53. During the show cause meeting on January 25, 1988, EPA enforcement staff concluded, according to Mr. Goodfellow, that

although CPS had conducted extensive 'studies' of its compliance problems and documented the cost of these studies and consultants' reports over a four-year period, *during this time it made no physical alterations or improvements to its inherited wastewater treatment system and repeatedly increased production*, thereby making it difficult, if not impossible, to evaluate the cause and extent of its problems or to determine the upgrading and/or redesign of its system which might be necessary to comply with its permit limitations.

Goodfellow Decl. ¶ 15 (emphasis in original). CPS apparently agreed to proceed with installation of the ozonation treatment unit and to make application for a new permit from the ADPC & E, and the unit was installed by mid-June 1988. *See* Defendant's Exhibit 55. CPS' noncompliance with the limitations and conditions of its NPDES permit and with the terms of the five administrative orders subsequently was referred to the United States Department of Justice for prosecution.

The referral also included violations by CPS of various monitoring and reporting

11. The EPA delegated its permitting authority to the ADPC & E pursuant to a November 1, 1986 agreement. *See* Rowe Aff., Exhibit 9.

12. The EPA was not aware at this time that CPS had stopped production of DNOC at the end of 1986. Goodfellow Decl. ¶ 12 n. 6. The EPA

contends that the fact that violations continued after cessation of DNOC production belies CPS' repeated assertions in response to the administrative orders that DNOC was the inhibitor of its biological treatment system and, therefore, its principal compliance problem.

requirements in the 1984 permit. CPS did not submit any of the noncompliance reports required by Part II.D.6. and 7. of the permit. Goodfellow Decl. ¶ 21. From the effective date of the permit until the DMR submitted for March 1987, CPS failed to report the frequency of sampling or sample types to verify compliance with Part I.A. of the permit. *Id.* From March 1987 through July 1987, CPS failed to specify the type of composite samples collected. *Id.*[13]

As noted above, when CPS' 1984 permit was issued, the EPA had not yet promulgated final effluent limit guidelines for the organic chemical industry. The final Organic Chemical, Plastics and Synthetic Fibers Category Effluent Limitations (OCPSF) Guidelines were published on November 5, 1987.[14] These guidelines did not affect or change the 1984 permit limits, but applied prospectively to the new permit to be written by the ADPC & E in 1989.[15] On April 29, 1988, CPS submitted an application for a Fundamentally Different Factor (FDF) variance to the ADPC & E, which subsequently referred the matter to the EPA for a determination.[16] The FDF variance request sought modification of the BOD limits in the 1984 permit,[17] as well as BOD limits (and COD or TOC limits if mandated)[18] in its new permit when issued. On February 22, 1990, the EPA issued a

Tentative Decision denying the request for variance on the ground that CPS failed to supply the raw $BOD_5$ wastewater data and basic information regarding the design and operation of its current wastewater treatment system which were necessary to assess the merits of the FDF claim. *See* United States' Memorandum in Opposition to CPS Chemical Company's Motion for a Stay, Exhibit 2.

The ADPC & E relied on the OCPSF Guidelines in developing new effluent limitations for $BOD_5$ and TSS in CPS' 1989 permit. It applied the standards in Subpart H of the final Guidelines across the board to the two parameters, which resulted in more stringent limits for these parameters than in the 1984 permit. Forsht Decl. ¶ 7. It also used the $BOD_5$ standard in the final Guidelines as a basis for setting a more stringent limitation for COD than in the 1984 permit. Although COD is not covered by the Guidelines, the EPA believes it may be the most troublesome component in CPS' wastestream. *Id.* ¶ 8. CPS appealed the 1989 permit to the Arkansas Commission on Pollution Control & Ecology, which resulted in the issuance of a draft modified permit which eliminates completely the COD and TOC effluent limits, and eliminates the concentration limits

**13.** The government also claims that the date blocks on CPS' DMRs establish that it routinely prepared and submitted DMRs well after the 15th day of the month following the completed reporting period, in violation of Part II.C.5. of its permit. *See* Goodfellow Decl. ¶ 21. However, the EPA later modified the permit to require that monitoring results be submitted by the 25th of the month. Defendant's Exhibit 11.

**14.** The OCPSF Guidelines were published at 52 Fed.Reg. 42522 and are codified at 40 C.F.R. Part 414, Subpart F. With exceptions not relevant here, the guidelines since have been upheld by the Fifth Circuit in *Chemical Mfrs. Ass'n v. USEPA*, 870 F.2d 177 (5th Cir.1989), *cert. denied sub nom. PPG Industries, Inc. v. EPA*, — U.S. ——, 110 S.Ct. 1936, 109 L.Ed.2d 299 (1990).

**15.** The preamble to the new OCPSF Guidelines indicates that the new standards did not apply to direct dischargers' existing permits, but rather would apply to these dischargers' new permits, which would be issued on a case-by-case

basis as their existing permits expired. *See* 52 Fed.Reg. at 42566.

**16.** The referral was pursuant to 40 C.F.R. § 124.62(e). The EPA determined that requests for FDF variances from the OCPSF Guidelines were of national significance and referred all variance applications in the first instance to EPA headquarters.

**17.** As noted above, the FDF variance would be prospective in nature since, at the time, the OCPSF Guidelines had not been applied to CPS' discharges. FDF variances are not available from the limits in a BPJ permit, so no retroactive relief was possible. *See* 40 C.F.R. § 125.-31(a)(1) (FDF variance approved only if, among other things, "there is an applicable national limit *which is applied in the permit* and specifically controls the pollutant for which alternative effluent limitations or standards have been requested" (emphasis added)).

**18.** COD and TOC are not covered by the OCPSF Guidelines.

for BOD and TSS. The EPA approved the draft modified permit in July 1991.

## IV.

CPS' DMRs establish its liability under the Act by showing that CPS has exceeded its NPDES permit limitations. The facts also indicate that CPS violated various terms and conditions of the five administrative orders issued by the EPA from April 3, 1985 to December 10, 1987. In addition, CPS has offered nothing to dispute the government's second claim for relief, the violation of the monitoring and reporting conditions of the permit, except the letter extending the deadline for submission of the DMRs from the fifteenth to the twenty-fifth of the month.

■ While CPS does not dispute the accuracy of the information on the DMRs, it asserts several affirmative defenses to liability under the Act and argues that there are genuine issues of material fact with respect to these defenses. As a threshold matter, CPS argues that at no time has it ever harmed the environment by discharging wastewater that has had an adverse impact on the receiving stream. As a matter of law, this is besides the point. Liability under the Clean Water Act is not determined by whether the discharge has an adverse effect on the environment.

■ CPS' first defense is that its right to due process was violated by the EPA's failure to process its administrative requests for relief from the 1984 permit and the enforcement branch's interference with the administrative review of such requests. According to CPS, the requests took two forms: first, to have the 1984 permit limits modified to reflect limits which were technologically achievable; second, to obtain a variance from the OCPSF effluent guidelines through an FDF variance application. CPS says it pursued both options, but the EPA refused to decide either one, and its enforcement personnel improperly influenced the processing of both requests in order to further the enforcement effort.

The touchstone of due process is the protection of a person against arbitrary action of government. *Dent v. West Virginia,* 129 U.S. 114, 9 S.Ct. 231, 32 L.Ed. 623 (1889). It serves to prevent governmental power from being "used for the purposes of oppression." *Murray's Lessee v. Hoboken Land & Improvement Co.,* 18 How. (59 U.S.) 272, 277, 15 L.Ed. 372 (1856). There is nothing to indicate that CPS was the victim of arbitrary governmental action in the failure to have its 1984 permit modified.

CPS says that it made at least ten written and countless verbal requests for modification during the period governed by the 1984 permit,[19] and none of those requests were ever processed because the enforcement branch refused to allow the permits branch to do so. To the contrary, in its July 1985 report, CPS assured the EPA that there was a "high probability" that the DNOC limit could be met and suggested that the DNOC limitation "should not be changed at this time." Instead, CPS proposed that it be given until January 1986 to optimize its system, after which time a modification could be made to the permit if CPS could demonstrate that the DNOC limitation could not be met. In its January 1986 report, CPS asked the EPA to consider, as one option, issuing a revised permit with interim effluent limitations while CPS continued to study the DNOC problem. Shortly thereafter, on February 28, 1986, the EPA issued its second administrative order which set less stringent "interim" limitations for COD, TOC, and DNOC. CPS responded that it would continue to conduct studies on controlling DNOC with the hope that such data could be used in setting new final effluent limitations. Regarding the issuance of a new permit, CPS indicated that it would "pursue the possibility" of obtaining an FDF determination relative to its DNOC limitations and possibly other parameters. CPS made no formal request for modification of its 1984 permit until early 1987. After the 1986

---

**19.** This assertion appears on page 17 of CPS' response to the government's motion for partial summary judgment, but without reference to any supporting documents, affidavits, deposition testimony or other evidence.

delegation of permitting authority to the State of Arkansas, the EPA no longer had the authority to process and give initial approval to permit modifications.

■ Even if CPS could show that it requested modification earlier, nothing suggests that the enforcement branch arbitrarily denied or interfered with the processing of such requests. Contrary to CPS' characterization, Mr. Goodfellow, the enforcement officer, did not testify that the enforcement branch refused to allow a non-complying permittee to have its permit modified. He simply stated that as a matter of regulation and agency policy, permits are not modified solely for the purpose of bringing a discharger into compliance. Goodfellow Dep. at 56–57. CPS has not shown that it necessarily would be entitled to a permit modification under the criteria set forth in 40 C.F.R. § 122.62(a). EPA officials indicated to CPS that permit modification would be considered with new data. Franke Dep. at 73. But it was not until 1987 or 1988 that CPS accumulated the data it says showed that the 1984 limits were technologically unachievable. Nothing in the extensive depositions or affidavits of EPA personnel taken in this case provides any factual support for CPS' allegations of impropriety. CPS was obligated under 40 C.F.R. § 122.41(f) to comply with its permit while a request for modification was pending, and its failure to do so provides grounds for enforcement. *Connecticut Fund for the Environment, Inc. v. The Upjohn Co.*, 660 F.Supp. 1397, 1413 (D.Conn.1987).

A due process defense to liability under the 1984 permit is not available with respect to CPS' effort to obtain an FDF variance from the OCPSF Guidelines. As explained above, the OCPSF Guidelines did not affect or change the 1984 permit limits, but applied prospectively to the new permit written by the ADPC & E in 1989. Thus, because an FDF variance was not obtainable from the limits in the 1984 permit, and applies only to a later permit, it has no bearing on the issues in this action.[20]

20. *See supra,* note 17.

CPS further claims it was denied due process by the failure of the EPA to process its modification and FDF variance requests within a reasonable time. For the reasons just mentioned, this defense also is without merit.

CPS also raises the equitable defenses of laches and estoppel, based on certain "facts": (1) the EPA's commitment to work with CPS to achieve compliance with permit limits which were admittedly unachievable when issued; (2) the EPA's commitment to modify the 1984 permit if the effluent limits were found to be unachievable; (3) the issuance of a series of administrative orders which approved extended schedules for compliance with the 1984 permit; (4) the EPA's refusal to entertain CPS' request for permit modification and its three year delay in resolving CPS' FDF variance application, both of which "prevented" CPS from achieving compliance.

■ Laches is unavailable to CPS for two reasons. First, the EPA, as an agency of the United States, is exempt from the consequences of laches. Courts generally have refused to apply the doctrine of laches to the federal government when it is acting in its sovereign capacity to protect the public welfare. *See, e.g., United States v. California,* 332 U.S. 19, 40, 67 S.Ct. 1658, 1669, 91 L.Ed. 1889 (1947); *Citizens and Landowners Against the Miles City/New Underwood Powerline v. Secretary, United States Dept. of Energy,* 683 F.2d 1171, 1178 n. 14 (8th Cir.1982); *United States v. Arrow Transportation Co.,* 658 F.2d 392, 394 (5th Cir.1981), *cert. denied,* 456 U.S. 915, 102 S.Ct. 1769, 72 L.Ed.2d 174 (1982); *United States v. Weintraub,* 613 F.2d 612, 618–19 (6th Cir.1979); *United States v. B.F. Goodrich Co.,* 609 F.Supp. 1, 5 (W.D.Ky.1984).

■ Second, assuming laches is an available defense to this action and viewing the facts in a light most favorable to CPS, a proper case for laches cannot be established on the evidence submitted. To invoke laches, a defendant must demonstrate delay in asserting a right or claim, that the

delay was not excusable, and that the delay cause undue prejudice to the party against whom the claim was asserted. *AmBrit, Inc. v. Kraft, Inc.*, 812 F.2d 1531 (11th Cir.1986), *cert. denied*, 481 U.S. 1041, 107 S.Ct. 1983, 95 L.Ed.2d 822 (1987). The doctrine is flexible; no fixed or arbitrary period of time controls its applicability. *Citizens and Landowners*, 683 F.2d at 1174. The particular circumstances of each case must be considered, "including the length of delay, the reasons for it, its effect on the defendant, and the overall fairness of permitting the plaintiff to assert his or her action." *Id.*

 There is nothing to indicate that the EPA did not assert its legal claim diligently. The discharges occurred between 1984 and 1989. The EPA issued five administrative orders relating to CPS' exceedances in an attempt to give CPS time to upgrade its treatment apparatus and attain compliance with the 1984 permit limitations. This action was filed on March 5, 1990. Such a delay, if any, does not present such egregious conduct by the government to warrant dismissal of this lawsuit because of laches.

 CPS' defense of estoppel likewise must fail. Courts are reluctant to apply estoppel to the government based on acts or representations of its agents, because "[w]hen the Government is unable to enforce the law ... the interest of the citizenry as a whole in obedience to the rule of law is undermined." *Heckler v. Community Health Services*, 467 U.S. 51, 60, 104 S.Ct. 2218, 2224, 81 L.Ed.2d 42 (1984). If equitable estoppel is applied against the government, a defendant must show "affirmative misconduct" on the part of government employees or agents. *INS v. Miranda*, 459 U.S. 14, 17, 103 S.Ct. 281, 283, 74 L.Ed.2d 12 (1982) (per curiam). In the absence of affirmative misconduct, the government may not be estopped by misrepresentations or misinformation given by its agents. *United States v. Manning*, 787 F.2d 431, 436 (8th Cir.1986); *Free Enterprise Canoe Renters Ass'n v. Watt*, 711 F.2d 852, 857 (8th Cir.1983).

██ The Court can find nothing in the deposition testimony of EPA officials cited by CPS to indicate that "[the] EPA told CPS that it would stay the new permit limits through an administrative order, and would modify the permit if compliance was found to be impossible." CPS' Response to Motion for Partial Summary Judgment at 3. Robert Franke, the EPA permit engineer, testified that at the time the CPS permit was written, a number of facilities were unable to comply immediately with the more stringent statutory levels of treatment which went into effect in July 1984, and that the EPA's policy was to issue permits consistent with the statutory requirements and to let the enforcement side of the agency issue "interim limits" and/or compliance schedules in administrative orders, to give these permittees a reasonable period of time to upgrade their systems to the required level of treatment. Franke Dep. at 17–18. Mr. Franke denied that he told a CPS official that if CPS was unable to meet permit limits after utilizing activated sludge treatment, CPS could obtain permit modification using its efforts as evidence that the permit limits were unfairly set. *Id.* at 54–55. While agreeing that permit modification can be a remedy if proper cause is demonstrated, Mr. Franke said that such a representation "implies that ... you try something, it doesn't work, you just go in and change it [the permit] ... I don't believe that's the way the program is set up." *Id.* at 55. Franke emphasized that he did not represent that CPS' permit would be modified if it could not comply with the limitations as written, because "I didn't have the authority to [say that]." *Id.* at 73.

The testimony of Robert Goodfellow, the EPA compliance (enforcement) officer, indicated that interim limits in administrative orders do not change the permit limits, but rather are a way of giving permittees time to complete construction or otherwise upgrade their treatment systems to come into compliance with the permit limits. Goodfellow Dep. at 17–20. He also stated that so long as the permittee is in compliance with its interim limits, the EPA, as a matter of enforcement discretion, does not en-

force the final permit limits. *Id.* By issuing the administrative orders, the EPA did not approve the technical merits of CPS' compliance plan; instead, the orders simply confirmed that based on the information then available to the agency, the permittee's timeframe for coming into compliance was reasonable. *Id.* at 47, 53–55.

As a general rule, "those who deal with the Government are expected to know the law and may not rely on the conduct of government agents to the contrary." *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 63, 104 S.Ct. 2218, 2225, 81 L.Ed.2d 42 (1984). Even if the EPA told CPS that it would stay the 1984 permit limits and would modify the permit if compliance was found to be impossible (and there is nothing to show that such representations were made), noncompliance with an effluent limitation is a violation of the law, and CPS could not reasonably have relied on statements to the contrary. *See United States v. City of Hoboken*, 675 F.Supp. 189, 199–200 (D.N.J.1987); *Connecticut Fund for the Environment, Inc. v. The Upjohn Co.*, 660 F.Supp. 1397, 1411–12 (D.Conn.1987).

CPS also says that the EPA advised CPS that any comment to or protest of the 1984 permit limitations would have to be supported by analytical data (which CPS contends was unavailable at that time), and that as long as CPS moved forward with the suggested "revisions, modifications and changes," there would be no reason for CPS to be concerned over the new, more stringent limits. Rowe Aff. ¶ 4. Thus, "in reliance on these representations, CPS did not contest its permit limits but undertook an extensive and costly series of modifications and studies in total compliance with all EPA requests and directives." *Id.* Again, however, CPS is presumed to have known the proper procedure for making public comment on and appealing the 1984 permit limitations. If it chose not to pursue those options for changing the permit, it did so at its own peril, notwithstanding any statements that may have been made to the contrary. Such statements, if made, could not reasonably have been construed to mean that CPS should waive its right to public comment on or appeal of the permit limitations.

In short, CPS has not shown any "affirmative misconduct" by EPA agents or employees. While CPS relies on *United States v. Bailey*, 467 F.Supp. 925 (E.D.Ark. 1979) to support its estoppel defense, this reliance is misplaced, as *Bailey* is readily distinguishable from the present case. First, good faith is not a consideration in Clean Water Act cases as it was with respect to the Corps of Engineers permit issued in *Bailey*. Second, the permit violation in *Bailey* was *de minimus*, 467 F.Supp. at 930, unlike the violations here.

Finally, CPS contends that it was technologically and economically impossible for it to comply with the 1984 permit limitations. CPS claims that it has investigated every treatment option available, and nothing has been found which will yield a compliant discharge. This defense, too, must be rejected. First, for the reasons explained in *United States v. City of Hoboken*, 675 F.Supp. at 197–98, impossibility is not, as a matter of law, a valid defense to Clean Water Act liability. *Cf. United States v. Boldt*, 929 F.2d 35, 41 (1st Cir. 1991) (Clean Water Act does not recognize defense of economic or business necessity). Second, even if such a defense were proper, it is unlikely the facts asserted by CPS would establish a valid impossibility defense. Although exceeding its limitations for DNOC, CPS reported in mid-July 1985 that it was maintaining compliance or near compliance with all other effluents. There were no major exceedences of the 1984 permit limits for COD, TOC, TSS, and $BOD_5$ until mid-1986 to early 1987. Third, appeal at the time of the issuance of an NPDES permit, pursuant to Section 509(b) of the Act, 33 U.S.C. § 1369(b), is the statutory remedy for review of allegedly unreasonable NPDES permits. As shown above, CPS knew that the 1984 draft permit called for drastic reductions in effluents based on an unchanged flow of 52,000 gallons per day; it also knew that its production at the West Memphis facility was increasing substantially. Defendant's Exhibit 42. Having failed to timely appeal its 1984 limits,

CPS cannot now challenge in this enforcement action the merits of the limitations and conditions imposed in the 1984 permit on the ground that it was impossible to comply with those limits.

Having found no Clean Water Act cases to support its impossibility defense, CPS relies on Clean Air Act (CAA) cases, which arise under a different statutory scheme. Under the CAA, a statewide plan to implement certain nationwide ambient air quality standards is drafted by the state and approved by the EPA. Since it is not necessary to consider the technological feasibility and economic impact of the state plan on individual facilities in the plan approval (or other preenforcement) stage, courts have indicated that such factors may be raised in facility-specific enforcement proceedings instituted under section 113 of the CAA. *See, e.g., Union Electric Co. v. EPA,* 593 F.2d 299, 306 (8th Cir.1979); *Indiana & Michigan Electric Co. v. EPA,* 509 F.2d 839, 844 (7th Cir.1975). However, NPDES permits issued under Section 402 of the Clean Water Act are facility-specific. The effluent limitations in an NPDES permit incorporate engineering judgments as to technological and economic feasibility, based on specific categories of facilities and pollutants, which the individual permittee has the opportunity to challenge up front.

Only specified "upsets" or treatment system "bypasses," which are exceptional incidents beyond a permittee's control that result in temporary noncompliance with permit limitations, are recognized as affirmative defenses to strict liability under the Act. *See* 40 C.F.R. § 122.41(n) (upset), 122.41(m) (bypass). *See also Sierra Club v. Union Oil Co. of California,* 813 F.2d 1480, 1488–89 (9th Cir.1987); *Chesapeake Bay Foundation v. Bethlehem Steel Corp.,* 652 F.Supp. 620, 631 (D.Md.1987); *Connecticut Fund for the Environment v. The Upjohn Co.,* 660 F.Supp. 1397, 1415–16 (D.Conn.1987). Nothing indicates there are factual issues in this case relating to such defenses.

For the foregoing reasons, the Court rejects CPS' affirmative defenses to the strict liability standards of the Clean Water Act. Although CPS cannot preclude liability based on these defenses, many of its arguments may be relevant to the issue of damages.

V.

CPS' last hope is to argue that granting summary judgment would violate its right to a jury trial on the issue of liability under the Clean Water Act, which was recognized in *Tull v. United States,* 481 U.S. 412, 107 S.Ct. 1831, 95 L.Ed.2d 365 (1987). It is well settled, however, that juries are empaneled where there are disputed issues of fact and that where, as here, there are not such genuine issues of fact, summary judgment is the appropriate procedure for determining liability. CPS' reliance on *Work v. Tyson Foods, Inc.,* 720 F.Supp. 132 (W.D.Ark.1989), *aff'd in part and rev'd in part,* 921 F.2d 1394 (8th Cir.1990), is misplaced. Unlike the present case, the Clean Water Act liability issue went to the jury in *Work* because there was a factual question relating to causation.

VI.

The Court finds that the government's motion for partial summary judgment on liability should be granted. The amount of damages will be determined at trial to the Court scheduled for December 3, 1991.

IT IS SO ORDERED.